OSCAR CLARK v. MISSISSIPPI RIVER & BONNE TERRE RAILWAY COMPANY, Appellant.—23 S. W. (2d) 174.

Division One, December 30, 1929.

*Thomas J. Cole* and *P. S. Terry* for appellant.

*Hay & Flanagan* and *O. Lee Munger* for respondent.

RAGLAND, J.—This is an action for personal injuries alleged to have been caused by defendant's negligence. The injuries were occasioned by plaintiff's falling in his automobile through a bridge over which he was attempting to pass while traveling on and along State Highway No. 9: the railroad owned and operated by defendant passed through a cut under the bridge. The petition alleges:

"On or about the 22nd day of September, 1925, he (plaintiff) was driving and operating his automobile northwardly along and upon old Missouri State Highway No. 9, an open public highway of the State of Missouri, and was approaching a bridge maintained by defendant across its tracks and right of way a short distance south of Bonne Terre, in the County of St. Francois, said bridge being open and public; that as plaintiff was crossing said bridge the wheels of his automobile struck an opening in the floor of said bridge caused by the bridge falling at said point due to the negligence and carelessness of the defendant as hereinafter set forth, thereby directly causing plaintiff's automobile to overturn and plaintiff to be thrown

therefrom to the ground twenty feet below, whereby plaintiff sustained the hereinafter described serious and permanent injuries.

. . .

"That defendant negligently failed to exercise ordinary care to maintain said bridge in reasonably safe repair and condition for ordinary travel by persons using said bridge in that it did on said date and for a long time prior thereto, negligently suffer and permit the beams and timbers supporting said bridge to become and remain in a rotten, decayed and weakened condition so that the said bridge was caused to fall, when the defendant knew, or by the exercise of ordinary care could have known, that the said beams and timbers were rotten, decayed and weakened and that said bridge was likely to fall on account thereof, in time thereafter by the exercise of ordinary care to have repaired the same prior to the 22nd day of September, 1925, and thus and thereby have avoided plaintiff's said injuries, but negligently failed to do so."

The answer consists of a general denial and a plea of contributory negligence.

The highway in question is the main road running south from Bonne Terre to Farmington. It was built many years ago, and was originally known as the Potosi and Ste. Genevieve Road. At the time of the trial it was known as Highway No. 9. The railroad was built after the highway, about thirty-five years ago, intersecting the highway a few miles south of Bonne Terre. The crossing was made through a cut, rendering a bridge necessary, and one was built. Estimates of the distance from the bridge to the bottom of the cut ranged from twenty to thirty feet. The bridge constituted a part of the highway and was so used by the general public.

The cut through which the railroad passes is approximately sixteen feet wide at the bottom and twenty-five feet wide at the top. The bridge over it was a wooden structure about thirty feet in length: it was supported by timbers, there being two bents, one on each side of the cut: the one on the north side had a wooden log for a base, the one on the south side rested on a rock. The bridge was constructed something like thirty-five years ago, presumably at the same time the railroad was built. There were wooden rails or bannisters on each side about waist high. On the morning of September 22, between six and 6:30 o'clock, a portion of the bridge at the north end fell, leaving the south portion standing. The approach to the bridge from the north was downhill, but from the south uphill. Plaintiff's evidence tended to show that one approaching from the north, after the north end of the bridge had given way, could see that a part of the bridge was out before coming upon it; but one approaching from the south could not do so until right at or on the south end and within from eight to ten feet of the break.

On the morning in question, and a few moments after the north end of the bridge had fallen in, plaintiff approached from the south going to his place of employment at Desloge; as he neared the bridge he saw two automobiles standing at the right of the road near the bridge approach; he also saw an automobile standing at the side of the road just across the bridge: he drove by the two automobiles on the south end and entered upon the bridge, traveling at the rate of from twelve to fifteen miles an hour. After he had gotten on the bridge he discovered the collapse of the north end and endeavored to stop, but his car went on into the opening, turned over and fell bottom-side up across the railroad track below. As he passed the cars on the south end the occupants of one car, who had been told of the condition of the bridge before they reached it, shouted a warning to him, but he did not hear them. The side curtains of their car as well as those of his own were up: there was a drizzling rain.

It was plaintiff's contention at the trial that the bridge gave way because the timbers supporting it were decayed and rotten: defendant insisted that it was caused by an earth slide under the north end resulting from recent heavy rains. Under the evidence the jury could have found either way as to this issue.

There was evidence on the part of plaintiff that for a period of six or eight months prior to said September 22nd, there had been a noticeable shaking of the bridge while a vehicle was passing over it. One of plaintiff's witnesses, who had been employed in defendant's bridge department, testified that on an occasion about two weeks before the bridge fell he had observed that "some of the logs were rotten at the bottom" and that the bridge had seemingly shifted northeast from its original position six or eight inches. He further testified that at that time he called the attention of the defendant's bridge foreman to the conditions he had observed, but that the latter said that the bridge was good for a long time.

There was no direct evidence as to who built the bridge: it does appear, however, that defendant's "bridge and building superintendent" made "a thorough examination" of this bridge, in connection with other bridges on defendant's road, at least every two weeks; and that when defendant cleared up the debris on its track, after the bridge had collapsed, it put all of the old bridge timbers, which were not so rotten as to be useless, on its flat cars and hauled them away.

For a period of four or five months prior to said September 22nd, plaintiff in going to his place of employment and returning home passed twice daily in his automobile over the bridge; he had such knowledge of the bridge as would naturally be acquired by such use of it; he had noticed that it shook perceptibly when he drove over

it; he was a carpenter by trade; he found no occasion for making an examination of the bridge, and he did not do so.

The evidence as to plaintiff's injuries will be summarized hereafter. The jury returned a verdict in his favor assessing his damages at $10,000. From the judgment entered thereon defendant appealed.

There is such a commingling and overlapping of appellant's contentions, as briefed under its points and authorities, that it is difficult to isolate each and then set out all succinctly. As we understand it, however, they are as follows:

I. The trial court erred in not sustaining defendant's demurrer to the evidence, for the reasons: (1) The evidence failed to show that the defendant either built or undertook to maintain the bridge for the benefit of the traveling public; (2) the passage of the Public Service Commission Law relieved defendant of any duty that might have devolved upon it to maintain the bridge, unless and until it was required to do so by an order of the Public Service Commission, and no such order was ever made; (3) the plaintiff did not charge, nor did the evidence show, that defendant was guilty of any act of negligence; and (4) plaintiff was guilty of contributory negligence as a matter of law.

II. Plaintiff's principal instruction was erroneous: (1) plaintiff was not entitled to go to the jury, the demurrer should have been sustained; and (2) in hypothesizing the facts which would entitle the plaintiff to a verdict, the instruction concluded: "and that at the time plaintiff was in the exercise of ordinary care for his own safety."

III. The verdict was excessive.

I. (1) Appellant does not deny that it built and owned the bridge: it says that the plaintiff failed to prove that it did. After the evidence disclosed that it put the usable timbers that had entered into  the construction of the bridge on flat cars and hauled them away, it does not become appellant to raise the question of ownership. It does not deny that it was maintaining the bridge, it merely asserts that plaintiff did not prove that it was undertaking to maintain it for the benefit of the public who in traveling on State Highway No. 9 had occasion to pass over it. If appellant was not endeavoring to keep the bridge in a reasonably safe condition for the use of such traveling public, it was clearly remiss in its duty. Such duty was enjoined upon it by the statute under which it received its charter and by the common law as well. What is now Section 9850, Revised Statutes 1919, provides:

"Every corporation formed under this article shall . . . have power: . . . fourth, to construct its road across, along or upon any stream of water, water course, street, highway, plank road, turnpike or canal which the route of its road shall intersect or touch, but the company shall restore the stream, water course, street, highway, plank road and turnpike thus intersected or touched to its former state, or to such state as not unnecessarily to have impaired its usefulness."

The applicable rule of the common law finds apt statement in Kansas City v. Railway Co., 102 Mo. 633, 640:

"Where a railroad crosses a highway already in existence, the crossing must be made with as little injury as possible to the highway; and the railroad company must erect whatever structures are necessary to the convenience and safety of the crossing. This duty is a continuing one, without any express statutory requirement. . . . And this continuing duty is in no manner cut down by charter provisions or statute law allowing the company to construct its road across highways in such manner as to afford and leave the highway in good repair for public use. [Citing Cases.] Where the duty of erecting and maintaining a bridge devolves upon the company, it is not enough that the bridge was adequate when first built; for, if by increase of population in the neighborhood the bridge becomes inadequate, the company must make the necessary alteration to meet the present needs of the public."

It must be presumed that the defendant's weekly inspection of the bridge in question was pursuant to an undertaking on its part to keep the bridge in such state of repair that neither the public using its railroad nor those traveling the highway would be endangered by it, because that was its plain duty.

(2) The Public Service Commission Law was intended to supplement, not repeal, existing law, except where in direct conflict with it. Had the crossing been installed or altered after the organization of the Public Service Commission it would have been necessary for the commission, under Subdivision 2, Section 10459, Revised Statutes 1919, to have first determined and by its order prescribed the "terms of installation, operation, maintenance, etc.," and there can be no doubt, but that had it taken cognizance of the condition of the crossing in question as it existed prior to the falling of the bridge, the commission could have ordered the bridge repaired or reconstructed and prescribed the terms of installation and maintenance and the apportionment of expense. But until the commission assumed jurisdiction with respect to this particular crossing and made some such order the defendant's duty and obligation in the premises remained undisturbed. There was no showing that the commission had in any way intervened, and the burden in this respect was upon the defendant.

**416**

(3) This ground of the demurrer points out no specific deficiencies, it is a mere generalization. It will be so dealt with. A reading of the portions of the petition set out in the statement will make it obvious that the defendant was charged with actionable negligence. It is only necessary to add that substantial evidence was offered in proof of every averment of the petition relating thereto.

(4) Appellant's contention that plaintiff was guilty of contributory negligence as a matter of law seems equally devoid of merit. In passing, however, it should be noted that the fact that plaintiff was a carpenter is stressed. How that fortuitous circumstance could, under the facts of this case, have any bearing on the question is left dark. Plaintiff's relation to the bridge was that of traveler, and not carpenter. Generally speaking, it may be said that a carpenter, for the purpose of self-protection, is no more called upon to examine the substructures and supports of the bridges over which he passes than other people who travel the highway—even though the bridges perceptibly shake during the passage. The evidence does not disclose a single fact which would have tended to bring home to plaintiff notice of the dangerous condition solely because of his special knowledge of timbers and the laws of mechanics. He is chargeable therefore only with such knowledge or notice as would have derived under like circumstances to persons of the same general average of intelligence and experience. Whether or not he was in the exercise of due care when he drove upon the bridge and proceeded across without stopping to make any investigation was, under the circumstances shown by the evidence, for the jury and not the court to determine.

II. The requirement of Section 19 of the Motor Vehicle Act (Laws 1921, 1st Ex. Sess., p. 91), that "Every person operating a motor vehicle on the highways of this state . . . shall exercise the highest degree of care," applies, according to its express language, to the operation of the vehicle. Plaintiff's negligence, if any, was not a failure to operate his automobile with the highest degree of care, but his attempt to drive over a bridge when he knew that it was old and shaky and that cars standing at each side were for some reason not attempting to cross. The instruction in the use of the term "ordinary care" correctly defined the degree of care which plaintiff was required to exercise for his own safety. See Alexander v. Barnes Grocery Co., 7 S. W. (2d) 370, 372. The remaining objections to the instruction were disposed of in ruling the demurrer.

III. At the time he received the injuries for which he seeks to recover damages plaintiff was forty-three years old and was earning on an average of $4.80 a day. With respect to such injuries he testified:

"I didn't know anything until the men got a hold of me and they brought me out of the coma. I was bruised where I had struck my head and shoulders. I was cut here and bruised down here. I was down under the car. . . . Some man put me in a car and took me to the hospital. I was there three days. They put iodine in my cuts. They gave me aspirin for pain. I was suffering in my head, back and sides. Dr. Smith examined me. I don't know anything about having broken bones. I was in the hospital three days, and was in bed most of the time. Dr. Gaebe at Desloge treated me from the second day after I went home until the 16th day of October. Then I went to Barnes Hospital. I stayed at Barnes Hospital from the 16th day of October to the 23rd; was treated by Dr. Stone. He made a collar to support my head. . . . I wore it practically all the time. I had a pain in the back part of my head. I received treatment from Dr. Lighter. He told me to wear the collar. I wore it from the 18th day of October to the 12th of December. I also went to see Dr. Farr at Flat River. He was a chiropractor. I am still suffering from pains and have a hurt in my neck. Around the back part of my head. I can turn my head to the left, but I can't turn it to the right. I struck my head on some part of the automobile when I fell. The pain is continual. I can't sleep on account of the pain. I had never been troubled with that kind of pain before. I had never had any trouble with my sleeping before. I haven't done any work since the accident except some little cementing for Mr. Forshee. When I stoop over it hurts my head. Have a severe pain in my head. I have dizzy spells; I have them several times a day. I have lost weight. I did weight 128 pounds; now I weigh 107. I am nervous at all times. I wasn't that way before I was hurt."

Of the five physicians named in his testimony as having treated him, plaintiff called but one to testify in this case, and that was Dr. Stone. He testified:

"From my examination I found a fairly marked spasm of his neck muscles. A very decided limitation of all motions of the cervical region. I believe he had a severe strain, probably a traumatic arthritis in his cervical spine. I did not examine him from a nervous standpoint. He was given heat and what we call a 'Thomas collar.' That is made of cardboard to fit around the neck; is padded so as to put the head and neck at rest. In my opinion the condition I found there might interfere with his performing manual labor. . . . I found nothing wrong with Mr. Clark below his neck. There was nothing wrong with his legs. I made this examination strictly

from an orthopedic standpoint. The fall described in the evidence I think could cause the injury. The condition could be permanent. I should not think it would be permanent . . .

"Q. Assuming, doctor, that after a period of twelve months, the plaintiff in this case had not recovered from the condition you found existing in his neck at the time of your examination and treatment, that after a period of twelve months he was still suffering from that condition and has not improved any, would you say that that would lead you to believe that the condition is permanent? . A. I don't think it would. . . . I did not find any of the tissues torn, but I did feel that he had a strain or a sprain. The condition that I found him suffering from at the time of my examination could cause pain. I think it might cause loss of sleep."

Dr. Stone in response to questions asked by plaintiff's counsel further testified: *Sometimes* inflammation in a joint will cause an ankylosed joint; a fall or bruise of a joint *sometimes* causes inflammation; a bruise of the bones in the neck *could* cause inflammation in those bones; and if they become inflamed a stiffening or ankylosis *could* result. There was, however, no evidence that the bones in plaintiff's neck or the tissues immediately surrounding them were either bruised or inflamed.

Dr. S. F. Thurman, a physician who lived in Potosi and who was appointed by the court to examine plaintiff, was called as a witness by defendant. He testified:

"I examined him all over; I took his temperature, I examined his pulse, his heart, vital organs and neck. I found nothing from the physical examination that was abnormal. He made some complaint. I did not discover anything wrong with his neck. I noticed his pulse was a little rapid. Perhaps walking up the stairs in the heat or exercise would do that. He might have turned his head to the left a little, but he didn't turn it to the right. I couldn't tell about the pain. I couldn't find anything that would indicate that. I had to take his word to a certain extent. I didn't find any deviation from the normal growth of the spine. I examined his spine. I did not find any joint out of line in any way. I saw nothing to cause him to be nervous, that would prevent sleep at night, or cause pain or dizzy spells. I think an X-ray would show ankylosis if it were there. It might show an inflamed condition of the cartilage between the joints. . . . I had no evidence of tenderness of the neck except what Mr. Clark told me. There is a great deal of pain at the beginning of an ankylosis. An ankylosis is the connecting of one out of two. It eliminates the joint. When you eliminate a joint and take an X-ray it would show the condition."

We have examined the record in vain for any substantial evidence that plaintiff's injuries are permanent or that his earning power has been permanently diminished or impaired.

"To entitle a plaintiff to enhance his damages with compensation for future consequences resulting from the permanent condition of his injury he must perform the primary duty of showing *by evidence* the reasonable certainty of the existence of such conditions. Notwithstanding the adverse opinion of his medical experts had his injuries themselves been of such a nature as to make their permanency apparent to a person of ordinary intelligence, the plaintiff would have been entitled to have this fact considered by the jury as an element of damage. But in the very nature of his injuries their duration was necessarily a matter of pure guesswork.

"Consequences which are contingent, speculative or merely possible are not to be considered. To justify a recovery for apprehended future consequences, there must be such a degree of probability of their occurring as amounts to a reasonable certainty that they will result from the original injury. To say of a thing it is permanent means that it *will continue* regardless of contingency or fortuitous circumstances."

The foregoing language of the Kansas City Court of Appeals in Wilbur v. Railway Company, 110 Mo. App. 689, 697-8, so aptly characterizes the state of the evidence under consideration and the principles of law applicable to it that it could well have been written in this case: it is accordingly adopted as dispositive of the question of prospective damages.

A period of about a year elapsed between the date of plaintiff's injury and that of the trial: during that time, according to his testimony, he was wholly incapacitated, or practically so. Had he been employed every working day during that time his earnings in the aggregate would not have exceeded $1,500. He paid Dr. Stone $40 for professional services, and he no doubt paid or incurred other expense for treatments and hospital service, the amounts of which were not shown. We are of the opinion that $1,000 would not only reimburse him for all of these items but compensate him for whatever pain or inconvenience he had suffered. If he is unwilling to accept a judgment of $2,500, he will of course be afforded another opportunity for showing if he can that the injuries of which he complains, or some of them, are permanent.

The judgment of the circuit court is affirmed, on condition that plaintiff, respondent here, within ten days enter in this court as of the date of the original judgment a *remittitur* in the sum of $7,500; otherwise the judgment will be reversed and the cause remanded for another trial. All concur.