Bobby GOOCH, Respondent,

v.

Donald Dean LAKE, Appellant.

No. 46727.

Supreme Court of Missouri,

Division No. 2.

Sept. 14, 1959.

———◆———

Don Chapman, Chapman & Chapman, Chillicothe, for appellant.

Walter Allen, Brookfield, Hess & Collins, Macon, for plaintiff-respondent.

LEEDY, Judge.

Action for damages for personal injuries sustained by Bobby Gooch while riding as a guest-passenger in a motor vehicle (a jeep) operated by Donald Dean Lake. Gooch obtained judgment for $15,000, and Lake has appealed. The parties will be referred to as styled in the trial court.

The casualty occurred on a public street in Marceline about 8 or 8:30 p. m., on July 4, 1955, when the jeep being driven by defendant southward on Kansas Avenue at a high rate of speed overtook, and ran into the rear end of, a Chevrolet being driven in the same direction by Mrs. Geneva Bailey on her own, or right-hand, side of said street which, at this place, was straight and gradually downgrade in the direction being traveled. The relevant facts will be stated in connection with the points to which they relate.

Defendant's points go only to the instructions and the amount of the verdict, the first of which is directed against the giving of plaintiff's instruction No. 4, reading as follows:

"The Court instructs the jury that if you find and believe from the evidence that on the occasion mentioned in evidence the defendant was driving a jeep-automobile in a southerly direction on Kansas Avenue in Marceline, Missouri, that the street at that place was gradually down grade and straight, that on this particular occasion it was dark, and

"If you further find and believe from the evidence that Bobby Gooch was riding as a guest in the jeep-automobile and was exercising ordinary care for his own safety, and did not control, or have any right to control, the operation thereof, and that the said jeep-automobile was behind and approaching a Chevrolet automobile being driven by Geneva Bailey in a southerly direction upon the right hand side of said Kansas Avenue, and if you further find that defendant negligently caused, allowed and permitted said jeep-automobile to run into, strike and into collision with the rear end of the Chevrolet automobile at said time and place, and that as a direct and proximate result thereof plaintiff was injured, then you are instructed that plaintiff is entitled to recover and your verdict should be in favor of Bobby Gooch."

It is charged that the instruction is erroneous for these reasons: (1) As being broader than the pleadings; (2) as not within the issues raised by the pleadings; and (3) as submitting "general negligence, whereas the petition contains charges of specific negligence." The first two of these are so closely akin as to be practically equivalents. Both are based on the fact that the petition did not aver the particular part of

the Chevrolet with which defendant's vehicle came in contact, but notwithstanding such omission the instruction submitted the hypothesis of a collision "with the rear end of the Chevrolet." The recitals of the petition and instruction in these respects, and upon which defendant's objections are based, are these:

| Petition | Instruction |
|---|---|
| "* * * [T]he said Donald Dean Lake * * * carelessly and negligently caused, allowed, and permitted the vehicle, then and there being operated by him, to collide with a motor vehicle then and there being operated by one Geneva Bailey, who was then and there operating a vehicle along said Kansas Avenue, and on the right hand side thereof in the same direction as defendant was operating his motor vehicle." | "* * * [I]f you further find that defendant negligently caused, allowed and permitted said jeep-automobile to run into, strike and [come?] into collision with the rear end of the Chevrolet automobile at said time and place, * * *." |

■ As will be seen, there is a marked want of contrast between these recitals. Full proof of the fact of a collision would necessarily include not only a showing as to the manner in which the same occurred, but also the particular point or points of contact. We fail to see how defendant could have been prejudiced. Moreover, proof of the fact of a rear-end collision came in wholly without objection, and was uncontradicted. In such a situation the following statutory rule applies: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Section 509.500 RSMo 1949, and V.A.M.S.

■ The last objection to the instruction is that it "submits general negligence, whereas the petition alleges specific negligence." We need not elaborate on this point because the allegations of specific negligence here referred to by defendant were those having to do with speed and lookout, both of which were abandoned in the submission. This leaves defendant in the position of expressly avowing that the petition's *other* allegations of negligence (hereinabove excerpted in part) and the submission of the same by instruction No. 4 (set out in full) were upon the theory of general negligence, thus undercutting the ground of attack now urged. However, we do not regard such other negligence allegations of the petition (last above mentioned) nor instruction No. 4 as being based upon or embodying the theory of general negligence, but directly to the contrary, i. e., specific negligence. Comparable allegations and hypothesizations were presented in Jones v. Central States Oil Co., 350 Mo. 91, 164 S.W.2d 914, where the conclusion just indicated was reached. The doctrine is more fully elucidated in Chiodini v. Terminal R. Ass'n, Mo.App., 287 S.W.2d 357. See, also, State ex rel. Spears v. McCullen, 357 Mo. 686, 210 S.W.2d 68.

■ Plaintiff's instruction No. 6 on the measure of damages submitted as elements to be considered in arriving at the amount of plaintiff's damage, the following: (1) The injuries sustained by him, if any; (2) the physical and mental pain and anguish endured by him on account of said injuries, if any; (3) such loss of earnings as he has sustained since becoming twenty-one years of age; and (4) future loss of earnings, if any. The submission of the element of loss of earnings since becoming of age is assailed as being broader than the evidence,

in that there was no evidence as to such loss of earnings. Plaintiff became twenty-one years of age on October 31, 1955, following his injury on July 4 of that year. He returned to the University of Missouri in the middle of September 1955 and attended the whole of that school year as a senior. He had previously played football at the University during his freshman, sophomore and junior years, lettering in the latter two. He was on a No. 1 athletic scholarship until he was hurt, the value of which was a minimum of $925 for the school year. It included room, board, tuition, and, in addition, the right to work (for the University?) for $15 a month. Because of his injuries he was not able to play football during his senior year, and in consequence lost the scholarship. In the seven and one-half months after his twenty-first birthday until the end of the school year, the monetary value of the scholarship thus lost amounted to $870.77. There was no evidence of any other loss of earnings up to the time of trial. The defendant argues that the scholarship was a gratuity, and not earnings, and plaintiff counters with the proposition that if this were true, the fact that he could not play football during his senior year would have made no difference —he would have received the scholarship anyway. We think the fact that when he could no longer play football, he could no longer get the benefit of the scholarship, sufficiently demonstrates, as a practical matter, that the monetary value of the scholarship should be regarded as earnings, and having actually lost the amount indicated, it was not error to submit this element.

■ Defendant contends it was error to submit the element of loss of future earnings because there was no evidence of what the plaintiff would lose in the way of earnings in the future, and because there was no evidence that plaintiff's earning capacity had been impaired. It is true, plaintiff did not claim his injuries were permanent. In fact, he expressly disavowed such was their nature. Nor did he claim permanent impairment of his earning capacity (in the conventional sense) resulting from such injuries as he did receive. He was not disabled from performing the functions of a coach. Consequently, it is urged that having entirely recovered at the time of trial, and having no permanent injuries, plaintiff's earning capacity had not been impaired, and therefore he could not, and would not suffer any loss of future earnings. But this contention overlooks the nature of plaintiff's theory of recovery for loss of future earnings, and is, we think, not tenable. We have been cited to no case holding permanent injuries to be prerequisite to an award for loss of future earnings, although it is true that the ordinary personal injury case usually involves impairment of earning capacity resulting from permanent injuries. Under the peculiar facts here involved the situation is different. The evidence was to the effect that plaintiff, by reason of his injuries, was disabled from playing football at the University where he was majoring to become a coach. (It is fairly inferable that he intended to enter that profession after completing his military service.) It is this disability upon which plaintiff's claim of loss of future earnings is based. Don Faurot, the athletic director at the University, testified that because of the handicap, there is a difference in the starting salary of a young coach who has played football in his senior year and one who has not; that such difference varies, but as an average it would be $1,500 a year. This is direct evidence from which the jury might reasonably find plaintiff would sustain in the future loss of earnings as much as $1,500 during his first year as a coach, and answers the contention that there was no evidence of what earnings plaintiff would lose in the future. Plaintiff is entitled to be compensated for pecuniary losses which he is reasonably certain to suffer in the future as a direct result of his injuries, and we think it follows that the adverse effect upon his probable income as a starting coach has proper bearing on the question, and therefore it was not error to

submit the element of loss of future earnings.

■ The remaining question is whether, because of alleged excessiveness in amount, the verdict should be permitted to stand. Plaintiff was thrown out of the jeep and landed in the street. When the ambulance arrived he was groaning, and there was blood running out of his ear and mouth. He was taken to the hospital, where Dr. Smith, his attending physician, observed a severe ·contusion of the left eye, multiple abrasions, blood coming out of his left ear ("which is always a sign of injury to the skull"), as well as a fracture of the left clavicle or collar bone. Plaintiff was in a semiconscious condition—a stupor, he had lacerations and contusions of his chest wall, and there was no question as to his having a concussion of the brain—blood in the canal section and behind the eardrum. The doctor described a concussion as being a state or condition which is brought on by a severe blow to the brain, which is manifested by grogginess, and some change in blood pressure and pulse—actually a bruising of the brain itself. (On cross-examination the doctor stated that X rays failed to disclose any skull fracture.) Plaintiff was immediately treated for shock, his left eye was sutured, and he was put to bed with a sandbag 3 ·inches thick, 4 inches wide, and 6 to 8 inches long between his shoulders. He was catheterized and given a small amount of codeine. He was kept flat on his back with the sandbag between his shoulder blades for 6 or 7 days. He was not out of bed for 19 days, during which time he became dizzy when he was raised up. On his 19th day he got out of bed into a chair, and he was allowed to go home on the 24th day after his injury. While in bed at the hospital his head was kind of "fuzzy," he had dizzy spells once or twice, and he felt like his head was expanding. During his 24 days in the hospital numerous medications were required to alleviate plaintiff's pain. After his discharge from the hospital, plaintiff ·went to his home in Marceline, where he slept in a bed downstairs for two weeks, getting up only for his meals. It takes about four weeks, normally, for a broken clavicle to become rather stable, but it takes from six to nine months for it to be cured. There will always be a little deformity remaining in plaintiff's broken clavicle. Plaintiff also testified he had an injury to his nose which still caused a "little" or "slight" protrusion thereon at the time of the trial. The last time Dr. Smith saw him was shortly after he returned to school in 1955, and at that time he had no headache.

The hospital record shows the "final diagnosis" to have been: "(1) Contusion and laceration of left eye (2) Multiple contusions of left thorax and left shoulder (3) Comminuted fracture of left clavicle (4) Concussion of brain, moderately severe."

Dr. Smith, the attending physician, also testified that the following letter he wrote to plaintiff's attorney on October 3, 1955, (received in evidence as Exhibit E) summarized plaintiff's condition: "He was admitted to the St. Francis hospital soon after the accident in a semi-comatose state. At the time of admission it was evident that the patient had a severe head injury with a fracture of the basilar portion of the skull due to the fact that he had blood in the spinal fluid exuding from the left ear. It was also evident that he had a fracture of the left clavicle and multiple contusions and abrasions of the face, upper extremities, and back.

"The patient was put to bed, treated for shock and for his head injuries. He made a remarkable recovery and at the present date the fractured clavicle is healing and he has no residual headaches or dizziness.

"However it is felt that he probably will have some residual headaches and possibly some dizziness in the future because of his severe head injury." [Note: There was no evidence nor claim at the trial (more than two years after the accident) that plaintiff's dizziness or headaches still persisted.]

When plaintiff returned to the University in September 1955, he went to a psychiatrist complaining that he was under nervous tension, "unable to concentrate, of knowing what he was going to do in school"—said the psychiatrist. Tests were made which indicated "he could not remember recent things that happened, further he could not recall things." He was seen at these intervals: September 26 and 29; October 7, 13 and 24; November 3, 18 and 21. He was discharged on the latter date, at which time the psychiatrist made a report (received in evidence as Exhibit H) reciting, among other things: "Psychometric data, repeated on November 18, gave definite evidence of improvement. In the meantime the patient has been able to concentrate more adequately. He does not find it as difficult to complete his studies as he did the early part of the school year. * * *

"Final Diagnosis: Head injury, with concussion, as the outcome of a fracture of the skull, plus healed fracture of the left clavicle with a residual displacement of the proximal fragment.

"Prognosis: Good. In view of the overall findings, I am of the opinion that Mr. Gooch will be able to resume full physical activities by the fall semester of 1956."

Plaintiff's grades improved to the extent that he was really making better ones in the spring of 1956 than he did before the accident.

Plaintiff graduated in the second semester of the 1955–56 school year. The record is silent as to what he did after graduating until he volunteered for military service in March 1957, when, after undergoing a physical examination, he was accepted and given a 120-day deferment. At the time of the trial (October 1957) he was on furlough and had completed a total of two and one-half months in military training. In response to a question propounded by his counsel as to whether he was claiming any permanent injury, plaintiff replied, "Not as of today, I have no permanent injury." And on cross-examination he stated, "I have no permanent disability." The physician who examined him on defendant's behalf reported that during the course of that examination plaintiff volunteered, "There is nothing wrong with me." The psychiatrist expressed the opinion at the trial that "he is all right." She further testified that if spinal fluid gets out of the ear, "there has got to be a tear in the lining of the brain, but the body will heal a very severe blow."

The matter stressed in argument in support of the $15,000 award is the report of Dr. Smith (hereinabove set out as Exhibit E), and particularly that part stating that plaintiff "probably will have some residual headaches and possibly some dizziness in the future because of his severe head injury." The doctor also testified there will always be a little deformity in plaintiff's broken clavicle. This is the argument in that connection: "This evidence, coupled with the evidence concerning loss of past and future earnings, obviously convinced the jury and the trial judge, that the $15,000 was not excessive." It is to be borne in mind that under the evidence the maximum amounts allowable for past and future earnings were, respectively, $870.77 and $1,500, or a total of $2,370.77, thus leaving $12,629.23 as referable to the injuries sustained, and the physical and mental pain and anguish endured on account thereof. We are of the opinion that such amount is so disproportionate to the latter elements of damage shown by the evidence, as hereinabove detailed, as to require adjustment. Therefore, if plaintiff will, within 15 days, enter remittitur of $6,500, the judgment will be affirmed as thus reduced; otherwise, it will stand reversed, and the cause remanded for new trial on the issue of damages alone. It is so ordered.

All concur.