**Ruby Dee STEPHENS, Respondent,**

**v.**

**Helen Joyce GUFFEY, Appellant.**

**No. 51725.**

Supreme Court of Missouri,
Division No. 1.

Dec. 12, 1966.

Larry M. Woods, Columbia, for respondent; Orr, Sapp & Woods, Columbia, of counsel.

Terence C. Porter, Columbia, for appellant; Welliver, Porter & Cleaveland, Columbia, of counsel.

HIGGINS, Commissioner.

On December 23, 1963, at 4:30 p. m., Ruby Dee Stephens was driving her 1957 Oldsmobile and, while stopped at an intersection, was struck from the rear by Helen Joyce Guffey driving her 1959 Chevrolet sedan at a speed of 20 or 25 miles per hour. The impact was "fairly hard" and knocked Mrs. Stephens 30 to 35 feet forward. Repair estimate on the Oldsmobile was $330.-19; the Chevrolet sustained $400 damage. Mrs. Stephens had a verdict for $19,670 for personal injuries and $330 for property damage. Appellant's points question neither the submissibility nor the property damage but are concerned with injuries and causation.

Appellant's Point I is that the court should have ordered a new trial "for the reason that the verdict is too large to be sustained by the evidence adduced on any theory except that the plaintiff's condition at the time of trial was the direct and proximate result of the accident which was shown in evidence and since the evidence on this point was too unsubstantial and uncertain to justify such finding the verdict is clearly erroneous and must be reversed." Appellant concedes that plaintiff suffered an injury when struck from the rear by defendant on December 23, 1963, but takes the position that the verdict is so grossly excessive as to require reversal upon two theories: "First, the size of the verdict is such that to be sustained it must be based upon plaintiff's evidence of continued complaints of pain and disability and repeated hospitalization with respect to conditions, the causes and nature of which were so uncertain as to be totally incapable of being proven to be the direct and proximate result of the accident. Second, since plaintiff's own evidence shows that her continued complaints and disability may be the result of rheumatoid arthritis and drooping or sloped shoulders, neither of which was in any way connected with the accident, there was a failure of proof with respect to causation."

In addition to the evidence of the severity and type of collision, plaintiff, a 29-year-old mother of two children, experienced immediate dizziness and pain in her neck. The pain persisted as a dull ache "all that evening," and when she arose the next morning she was so sore she could hardly move. Her neck hurt "all the way around." She went to her work at Hubbard Heating in Columbia where she had done general office work for seven or eight months, but after about an hour she went to her physician, Dr. James Denninghoff. She had never had any difficulties with her neck, back, hands, arms, or shoulders prior to the collision; she had led a normal, active life, and had no difficulty of a physical nature. Dr. Denninghoff prescribed ultrasound treatments which send sound waves into affected areas, muscle relaxant and pain tablets. She continued her work and took the treatments every day except Christmas in the week following. She vomited on the first day and had sensation of liquid in her neck, "it made a squashing sound." Dr. Denninghoff kept increasing the pain medicine and, on January 10, 1964, put her in the hospital. She was there for six days and received cervical traction accomplished by putting a strap around her chin and pulling her head back by 5-pound weights as she lay flat. She could not stand the constant pull so the application was made "on two hours and then off an hour." In addition to the traction she received pain tablets, sleeping pills, and heating pad treatment. She returned to her work but after a day or two her arms started bothering her and when she moved them there was a "popping or thudding noise * * *. The left arm got very difficult to use." On January 27, 1964, she was returned to the hospital and to the care of Dr. Glenn McElroy, an orthopedic specialist. She was there for two weeks receiving cervical traction and physical therapy which included ultrasound, heat packs, and automatic traction similar to that taken three times a week between the two periods in the hospital. Automatic traction pulls the head up with twenty pounds of force and then releases. The treatment lasts twenty to thirty minutes. Following the second hospitalization she returned to work but she took codeine, tranquilizers, and relaxants, and continued her therapy. On March 28, 1964, she was again admitted to the hospital. "It was my back and my right leg—were beginning to bother me plus the fact that my shoulders and arms hadn't gotten any better and were still hurting quite badly." Leg traction through use of 5-pound weights was started during this third hospitalization which lasted until April 13, 1964. She attempted some of her work while in the hospital but her employer needed part-time help to assist her. In September, " * * * my back and leg got considerably worse * * * and then the arms and the neck hadn't gotten any better and at times, I could use my arms for awhile but after using them so long, things would fall out of my hands and they—they would get numb. After an hour's or so rest, I could use them some again, but they don't work quite right and at times I would get where I couldn't write." On October 26, 1964, she gave up her job and was re-admitted to the hospital. She stayed until November 20, 1964, during which period a myelogram was performed consisting of injecting dye into her spine. This process resulted in headaches and waves of pain upon movement. She also received her therapy, added whirlpool baths and began receiving painful M.S. electric shock. Upon release she continued such treatments and, in January, 1965, she took part-time employment at Columbia Service Bureau and was unable to work full time when her case was tried in May, 1965. At trial her right leg and back hurt. Her left shoulder hurt some but most of the pain in her neck is on the right side. Her right arm was worse. The pain in her right leg was down the inside, and the outside felt "numbish." She had muscle cramps and "charley horses" in her legs; "they draw quite badly" and the leg won't straighten out. Her right hip also hurt and there was a sharp pain a good bit of the time in her lower back. It hurt for her to turn her head. She had trouble walking; she had fear of

being jostled; housework hurts; her leg cramps when driving; she could not care for her hair as quickly; and she was no longer able to be active. Where she formerly made $90 per week pay, she now averages $45 to $50 per week. She takes sleeping bills and Excedrin and tires easily. She began limping in March, 1964, and cannot now walk without a limp. Her hospital bill was $1,533; Dr. McElroy's bill was $376. She had a bill from the University of Missouri Medical Center for consultation, tests, and X rays of $302.50, a bill of $50 from Dr. Denninghoff, and a drug bill of $75. All the bills were said to result from the collision and were described by the doctors as reasonable and necessary. She had a total loss of wages of $3,100. These special damages exceeded $5,400.

Thomas Hubbard, Mrs. Stephens's employer, observed her during her 8 a. m. to 4:30 p. m. working hours, and knew of no physical impediment prior to December 23, 1963. She was never off work and he knew of no complaints or trouble prior to the collision. After December 23, 1963, she seemed extremely tired and when she reached down to pick up something, " * * you could hear her muscles * * * you could hear what sounded like a squeak." In respect to her walking, "She would kinda sidle * * * shuffle along instead of walking like a person normally would." She was alert and able to get around well before the collision but became more cautious, less efficient, and slower afterward. Prior to December 23, 1963, she was cheerful, not emotionally upset, and a normal, active young woman.

Mrs. Stephens's next employer, Merle Buck, hired her February 16, 1965, for part-time work with knowledge of her disability. He noticed "an apparent discomfort or disability * * * and the nature of this discomfort appears to be in the back, neck and perhaps legs. * * * I have observed a stiffness in the movement of the head and neck. I have observed an apparent stiffness in the spine—in the back in observing her walking and sitting down and rising from a chair." She gets up "slowly and purposefully. * * * the citations that I've made have been constant and continual."

Thomas Coffman also observed Mrs. Stephens at her second employment. " * * she seems to be slow rising, she watches herself the way she moves herself, and she seems to have * * * a stiffness of the neck and she just doesn't move around the office like she should." He watched her when she did not know it and "She seemed to walk slow, she is slow and cautious, she kinda seemed to guard herself." Such movements are constant. She uses the office furniture for support.

Dr. James Denninghoff is a specialist in internal medicine. When he first saw Mrs. Stephens on December 24, 1963, she gave a history of the rear-end collision on the afternoon of December 23 and had pain in the neck on any motion of the head at that time. Upon examination "she had pain to where she couldn't move her head in the directions I mentioned." She had limitation primarily to the left. He had her take three ultrasound treatments and saw her next on December 28. She then seemed somewhat improved, "there was less soreness although there was some aching yet in the muscles * * *. At that time, because the symptoms were not very severe and because she did seem to be responding reasonably well, I recommended that she be put on some muscle relaxents and pain relievers and to see me if the symptoms should worsen as sometimes happens. Many times a person will seem to improve and then maybe a week or two or three or even four weeks later have a recurrence of symptoms sometimes even worse than the original symptoms." Ten days later, January 8, 1964, she noticed that the neck was becoming more painful as she stayed up and she was advised to work only half days. On the 10th she was complaining of recurrent nausea after her neck tired. She was becoming "run down looking" and "it was obvious that she should be in the hospital and I put her there." He placed her in the Boone County Hospital

and gave cervical traction. "* * * when it became apparent after her third day of hospitalization that she was not improving as well as I'd like her to, it became apparent that I would want a consultation and some help from Dr. McElroy and called him." He next saw Mrs. Stephens in January, 1965, when Dr. McElroy "wanted me to evaluate her from an arthritis standpoint." The tests "revealed one positive test only among several, indicating there might be an arthritic factor * * * involved in this problem, and at that point I advised her to see Dr. Gaunt." Dr. Gaunt of the University of Missouri Medical Center ran tests including two Latex Agglutination Tests which Dr. Denninghoff described as 90 per cent accurate and being the test he ran that showed positive. "He felt that rheumatoid arthritis was not a factor in this." Rheumatoid arthritis affects the joints including the spine and, according to Dr. Gaunt, would not be produced by Mrs. Stephens's accident. Dr. Denninghoff also stated that Mrs. Stephens's symptoms were consistent with the "whiplash" type of injury and said with reasonable medical certainty that her symptoms were the result of and consistent with being struck from the rear. In his January, 1965, examination, "she had a very loud cracking, popping noise in her shoulder, * * * you could actually feel a cracking and snapping. * * * she had some pain on straight leg raising," a symptom consistent with ruptured intervertebral disc, "and on pulling up the shoulder." Dr. Denninghoff, using his January, 1965, examination as a basis, connected her trial-time complaints to the injury he found and examined in December, 1963, and January, 1964. "The reason I would answer yes to that is because there is no history that I've obtained of any kind of pain or joint involvement, arthritis, limitation of motion, cracking of joints—no symptoms before the accident. At the time I first examined her after the accident, she had none of this cracking on lifting her arm or any of that part of it which subsequently developed, and it is only because she did turn up with a negative evaluation from an arthritic problem by Dr. Gaunt from an internal medical viewpoint where this was extremely carefully run down that there was no gouty arthritis or anything of that nature, but the conclusion that would seem logical to me would be that this was the result of the accident."

Dr. Lester Wolcott, a specialist in physical medicine at the University of Missouri Medical Center, saw Mrs. Stephens in February, 1965, upon request for consultation from Dr. Warren Sights, Chief of Neurosurgery at the Center. "Dr. Sights' examination, and borne out by my own, and noticeable on x-ray was a rather unusual slope or droop to the shoulders, and commonly we see what's called a thoracic outlet syndrome, causing numbness and tingling in the hand which is intermittent as a result of this droop and nerve being compressed against the first rib at times, and he had felt on his examination that this was a possibility because of the postural relationship of the shoulders to the spine. I agreed and prescribed shoulder elevator strengthening exercises to hopefully do away with this particular postural condition. * * * She had also complained of the back pain with radiation into the right leg which he had ruled out to his satisfaction, and I did to mine, that this was not as a result of neurological difficulty, it is a primary condition." In respect to her complaints of pain in the low back and right leg, he found tenderness over the areas of complaint by pressing with his hands and noting the patient's response. He also found muscle spasm by palpation which was increased in those areas. Her low back pain followed the dermatomal pattern of the fifth lumbar vertebra sensory distribution. As far as he was concerned Mrs. Stephens was disabled; she has myositis or inflammation of her muscles, which is very often the result of trauma. He treated the myositis with moist heat, ultrasound, and gentle stretching. His referral was for treatment of the radiating pain in the right arm and hand, pain in the neck and low back, and radiation into

the right leg. He last saw Mrs. Stephens on April 22, 1965, and she was no better.

Dr. William D. Gaunt is a specialist in internal medicine at the University of Missouri. He saw Mrs. Stephens February 8, 1965, upon referral by Dr. Denninghoff for tests for rheumatoid arthritis. He made a complete physical examination of the patient following a recital of her complaints dating back to December 23, 1963. "Examination of the joints revealed tenderness anteriorly at the shoulders. * * * There was slight tenderness over the right hip * * * the right hip showed some limitation of motion as compared to the left. * * * There was some tenderness at approximately the second cervical vertebra and along the right neck muscles, posteriorly in the back * * * there was tenderness medial to both of the shoulder blades—that's toward the spinal column * * *. There was tenderness to palpation feeling at about the fourth lumbar vertebra and to the right of that in the lower back. * * * The right lumbar paraspinal muscles were somewhat tighter than the left * * * muscles of the upper and lower arms were slightly tender to palpation. * * * The right anterior thigh * * * and the right calf were slightly tender to palpation too. * * * The x-rays of the cervical spine showed minimal narrowing of the C7, T1 inner space. * * * I was unable to find any definite evidence of rheumatoid arthritis at present." Her complaints of pain in his findings of tenderness to pressure were consistent with traumatic injury. "Q: Were there any symptoms which caused you to believe that she might have disc trouble in the lower back? A: She had tenderness at her fourth lumbar area and to the right of it and then with this muscle spasm, this raised the possibility of this consideration in the overall thinking about her problem as one possibility to think about."

Dr. Glenn McElroy first saw Mrs. Stephens January 11, 1964, at the Boone County Hospital upon referral by Dr. Denninghoff. She was then being treated conservatively and being given cervical traction. " * * * she gave me a history of being in a car accident * * * on December 23, 1963, at which time the car in which she was driving was hit from the rear." He recommended that conservative treatment by cervical traction, heat, and drugs be continued. Her first complaints were referable to her neck, upper back and upper extremities. " * * * she developed some back pain—some low back pain which at first wasn't too significant." Dr. McElroy also admitted Mrs. Stephens to the hospital on three other occasions as her condition worsened and in the course of those he was her main treating doctor. "I referred her back to Dr. Denninghoff to rule out any arthritic process which may be causing this type of thing." His January 11, 1964, examination "revealed very little positive findings. This mainly was soreness and discomfort and tenderness of the neck and upper back * * * X-rays * * * revealed some straightening of the normal cervical curve, and I felt that was due to muscle spasms * * * and it can be produced by trauma." His treatment varied through the course of hospitalizations. "It was all conservative in nature, but it varied from neck to lower back and at times both." The treatment was unsuccessful and he has never been happy with what he has accomplished. "She still has some abnormal finding, and we are worse than we were when I first saw her." In 1964 he injected cortisone into her shoulder to increase circulation and to try to get rid of soreness in muscles and tendons. She has tendon involvement because "There is tenderness, there is limitation—some limitation of motion pain of her shoulder, then also she has in her right shoulder, what I call a popping tendon or snapping tendon." Upon his May 11, 1965, examination, her complaints were "the same, if not more than they were before." She bent over very well "but with evidence of muscle spasm and with evidence of pain and discomfort—not only in her lower back but also in her right lower extremity." She guarded and protected her head and neck and her range of motion is limited and painful. She com-

plained of numbness in her arms and hands but these complaints did not follow a true dermatone pattern. On his last examination he found "some mild atrophy of her right thigh and calf. * * * This was a half inch difference in the circumference of her right thigh and a quarter inch atrophy of her right calf." Straight leg test for stretching the sciatic nerve was positive, "we produced pain in her back and extremity." There was a decrease in sensation in her right leg and ankle jerks were sluggish. He stated with reasonable medical certainty that in connection with this accident Mrs. Stephens "does have some permanent disability." "* * * the thing that puzzles me is her lower back because here she is showing more positive findings as we go along in her treatment, and it's leading up to interspinal pathology with pressure on a nerve * * *. I'm thinking in terms of pressure on a nerve root * * * going to the right lower extremity, * * * we are getting positive findings * * * not only pain, but we got some atrophy, we got decrease sensation, we are getting a little sluggishness of an ankle jerk, * * * and it is highly possible that she is—does have a disc involvement * * *." These findings indicate that she "could have" a ruptured intervertebral disc. Dr. McElroy spoke of a possibility of disc or low-back surgery if her condition continued to worsen. He recommended continuation of conservative treatment "to see what she is going to do." "Q: Dr. McElroy, can you state with reasonable medical certainty whether these symptoms that she has—and her condition—are a result of the collision occurring on December 23, 1963? A: I can only take this lady's history and my findings since then. She dates everything back to that time or after that time and that's—that's the only way I can say—taking that into consideration, I think it is tied in with this—with an accident." Dr. McElroy estimated that disc surgery would cost about $850 for fees, hospital, and services. Dr. McElroy performed the myelogram on Mrs. Stephens and it showed her

spinal canal to be within normal limits. His objective findings have been less than his patient's subjective complaints. He has, however, seen her walk with a progressing limp and her objective findings are consistent with a limp. He attributes the limp to pain in her leg and he has seen also the atrophy of the leg, decreased sensation, and pain on leg-raising tests. Dr. McElroy described Mrs. Stephens's permanent disability as soreness and stiffness in her neck and shoulder and some low-back problem. "Taking her history into consideration, the fact that she had nothing prior to this, I feel I am justified in saying that this is related to an accident. I feel she will have some permanent disability." He first thought Mrs. Stephens had mild injuries which should respond to conservative treatment. "Q: Dr. McElroy, is it unusual in these type of rear-end collision for these type of injuries, such as to her back, to develop two or three weeks after the occurrence? A: Pretty commonly they will come on at a later date. There's usually an early phase in which you have muscle spasms— the neck will often come on earlier than a lower back problem, but they—some of them do come on later." "I do not feel that Mrs. Stephens is malingering at all."

Appellant bases her Point I on Kimmie v. Terminal R.R. Ass'n of St. Louis, 334 Mo. 596, 66 S.W.2d 561, and Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644. In the first case plaintiff sought to recover for a malignant bone tumor alleged to have been suffered by a fall on defendant's premises. The medical testimony was sufficient to show plaintiff's condition but "* * * The opinion of the doctors that it might, could, or would result from the fall is no more than an assurance that such a result was scientifically possible. * * * It was not substantial evidence that it did result from it and there was not here other ample evidence, 'tending to exclude all other causes save the fall and to prove that the fall was the cause.'" 66 S.W.2d 1. c. 565 [4]. "Where there are other facts which tend to

show an accident caused a certain condition, the assurance of an expert that it is scientifically possible is of some aid to the jury in determining what are reasonable inferences to be drawn from such facts." 66 S.W.2d 1. c. 565 [9–11]. In the second case plaintiff sought to recover in an automobile collision case for a claimed aggravated pre-existing heart condition, and his physician testified that the aggravated condition could not have been caused by the trauma but only by other cause. The plaintiff was denied recovery because his own medical testimony was against him and he, as a layman, would not be competent to say what caused a heart condition. "The burden was on the plaintiff to show the cause. Evidence that the condition might or could have been caused by either injury or disease without any substantial showing as to which of the possible causes did produce the condition, furnishes no basis from which a jury could determine the cause." 59 S.W.2d 1. c. 646 [2, 3].

■ The testimony here of Drs. McElroy and Denninghoff considered the history of accident, Harp v. Illinois Cent. R. Co., Mo., 370 S.W.2d 387, 392 [6, 7], and their testimony, taken with plaintiff's own testimony and that of her employers, is substantial evidence by which plaintiff's trial-time condition reasonably could be found to be connected to the admitted rear-end collision and injuries of December 23, 1963. The evidence was substantial that Mrs. Stephens was a healthy, active young woman prior to the accident and is now a person with objective findings as well as subjective complaints of neck and back injuries with attendant radiating nerve pain and numbness, and with some degree of permanency. Rheumatoid arthritis was considered, tested for, and ruled out by Dr. Gaunt, and the shoulder-droop problem was fully developed by Dr. Wolcott and rejected in favor of myositis as a cause of her disability. Plaintiff's own evidence of her pain, discomfort, and disability following the accident and her freedom from such conditions prior to the

accident and similar evidence from her employers was substantial evidence of "other facts" from which a jury might find that her trial-time condition was caused by the accident. Ketcham v. Thomas, Mo., 283 S.W.2d 642, 649–650 [10]; Stevens v. Westport Laundry Co., Mo.App., 25 S.W.2d 491, 495 [1]; Perringer v. Lynn Food Co., Mo.App., 148 S.W.2d 601, 611 [21, 22]. See also Rogers v. Thompson, Mo., 308 S.W.2d 688, 694 [3], and Schroeder v. Western Union Telegraph Co., Mo.App., 129 S.W.2d 917, 923 [11], which distinguish this case and the supporting citations from Kimmie v. Terminal R.R. Ass'n, supra, and Adelsberger v. Sheehy, supra. The same distinctions would apply to Leavitt v. St. Louis Public Service Co., Mo.App., 340 S.W.2d 131, where the evidence went no further than to show that plaintiff's arthritis might or could have been aggravated by trauma, and Bertram v. Wunning, Mo.App., 385 S.W.2d 803, where the evidence stopped at testimony showing a hernia could have resulted from the accident.

■ Appellant charges error in permitting Dr. McElroy to testify to an estimate of additional hospital stay of two to three weeks at $25 per day, surgery fee of $400, and anesthetic fee of $50 for surgery "to correct a ruptured intervertebral disc when the doctor's testimony (1) failed to show that the plaintiff was suffering from a ruptured intervertebral disc and (2) showed that such operation was not recommended by him and that he could not state with reasonable medical certainty that such would be required." Appellant points to cross-examination testimony in which Dr. McElroy admitted that just because she has the symptoms consistent with ruptured intervertebral disc does not mean that she has such condition, and that other things could cause such symptoms; that he could not yet prove nerve root pressure but the abnormal findings in plaintiff's right leg were suggestive of some pressure; that although he was thinking in terms of low back or disc surgery he had not yet recom-

mended surgery, and that he would wait awhile yet. These cautions in the doctor's testimony do not, however, make the questioned testimony inadmissible. The testimony on cost of low-back surgery was admissible because it was related to correction of a condition which, in the least positive view of the doctor, was suggested to be or could be a condition from which plaintiff was suffering as a result of the accident. Dr. McElroy was commendably candid in admitting that he could not "definitely prove" a ruptured disc, but "We do not hold * * * that it is improper to ask an expert witness if something might, could, or would produce a certain result. An expert's view of possibility or probability is often helpful and proper." Kimmie v. Terminal R. R. Ass'n of St. Louis, supra, 66 S.W.2d 1. c. 569 [9]. The condition of low-back involvement suggestive of surgery and caused by the accident of December 23, 1963, is supported by previously detailed objective findings of Dr. McElroy and the other doctors, particularly Dr. Denninghoff, subjective complaints of plaintiff, and descriptive testimony from layman observers as to plaintiff's caution and limp. Such evidence when viewed in entirety rather than in isolated bits removes this case from speculative situations such as causes from a burn when the only testimony admitted of a "possibility," Hahn v. McDowell, Mo.App., 349 S.W.2d 479, 482 [1–3], and of tuberculosis from inhaling gasoline fumes where the doctor testified "if it is tuberculosis" length of life is "problematic," Plank v. R. J. Brown Petroleum Co., 332 Mo. 1150, 61 S.W.2d 328, 333 [7]. Dr. McElroy also testified that plaintiff had some permanent disability from her injuries and the collision which distinguishes her case from speculation on future consequences as proscribed in Mahany v. Kansas City Rys. Co., 286 Mo. 601, 228 S.W. 821, 825, and Clark v. Mississippi River & B. T. Ry., 324 Mo. 406, 23 S.W.2d 174, 179.

■ Finally, appellant says the verdict for $19,670 for injuries is excessive requiring reversal or remittitur. Plaintiff's injuries already have been mentioned in detail. At 29 years of age she had a life expectancy of 38.61 years, and she has some permanent disability and her condition is worsening. Her special damages, exclusive of hospitalization and fees for surgery not yet performed, are in excess of $5,400, and her ability to work full days, to do housework, and to engage in sports has been reduced.

"There is no precise formula for gauging whether a verdict is excessive. Each case depends on its own particular facts. Consideration must be given the nature and extent of the injuries and losses, plaintiff's age and * * * diminished earning capacity, if any, the changing economic factors and the amount * * * awarded and approved in cases similar or of fairly comparable injuries." Goodman v. Missouri Pacific R. R. Co., Mo., 312 S.W.2d 42, 49 [8]. These criteria negative a finding of excessiveness in this case. Hopkins v. St. Louis Public Service Co. (1964), Mo.App., 382 S.W.2d 442, upheld a judgment of $15,000 for injury in a rear-end collision to the neck and shoulder with neck and shoulder pain, headache and numbness in the left hand following the accident. Mrs. Hopkins had ten days' hospitalization with traction under a diagnosis of cervical spine sprain, partial separation of the acromioclavicular joint, contusion of the left knee and lordosis in the cervical spine due to spasm. She could not sit well and would need treatment in the future "which might * * * include an operation to remove the cartilage between the joint so as to relieve the pressure on the nerves." 382 S.W.2d 1. c. 446. She had lost some time from work and was now working irregularly. She had special damages exceeding $1,800. Riggs v. Metcalf (1958), Mo., 315 S.W.2d 791, upheld a judgment of $20,000 for a 29-year-old woman for whiplash injury in a rear-end collision. Mrs. Riggs had five days of hospitalization and six weeks of traction. She quit work and was limited in her housework. She

had not been discharged from doctor's care but felt she was improving. Her medical expenses were slightly over $1,000. Appelhans v. Goldman (1961), Mo., 349 S.W.2d 204, affirmed $20,000 for whiplash injury to the neck and spine of a 38-year-old nurse with life expectancy of 30.91 years. She was hospitalized for ten days, had limitation of head and neck movement, wore a collar and will not improve. She may be more seriously impaired than Mrs. Stephens but she has fewer years' expectancy and less loss of earning power. McCaffery v. St. Louis Public Service Co. (1952), 363 Mo. 545, 252 S.W.2d 361, reduced a $20,000 verdict to $16,000 and affirmed at that amount for cervical neck injury and partial dislocation of the collarbone suffered by a 51-year-old woman. She used traction three times a day for some time, lost about six weeks' work and $800, was never hospitalized, and had surgery recommended to help her collarbone problem. See also Kiger v. Terminal R. R. Ass'n of St. Louis (1958), Mo., 311 S.W.2d 5, affirming, after remittitur, a judgment of $20,000 for permanent injuries to the cervical and lumbar area of the back after finding the evidence insufficient on the presence of a ruptured intervertebral disc.

Appellant cites several cases in which the injuries and circumstances are not comparable to Mrs. Stephens's condition: Salzwedel v. Vassil (1961), Mo.App., 351 S.W.2d 829, affirmed $6,000 for neck injuries but there was no medical or hospital expense, nor was plaintiff ever hospitalized. Ficken v. Hopkins (1965), Mo., 389 S.W.2d 193, affirmed a $5,000 verdict, but the injury was bruising and shock to a 62-year-old woman and there was no evidence of permanence or of special damage. Statler v. St. Louis Arena Corp., Mo., 388 S.W.2d 833, and Bowyer v. Te-Co, Inc., Mo., 310 S.W.2d 892, involved ankle fractures; Brown v. Kroger Co., Mo.App., 358 S.W.2d 429, involved a cut vein and no wage loss; and there was no permanent injury to the 20-year-old plaintiff in Gooch v. Lake, Mo., 327 S.W.2d 132.

Judgment affirmed.

HOUSER, and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.