Kimberly R. ALCORN, Respondent,

v.

**UNION PACIFIC RAILROAD COMPA-
NY and National Railroad Passenger
Corporation, d/b/a Amtrak, Appel-
lants,**

Curtis Edwards, Respondent.

No. SC 82325.

Supreme Court of Missouri,
En Banc.

May 29, 2001.

Rehearing Denied July 24, 2001.

Thomas B. Weaver, Theidore J. Williams, Jr., Jeffrey T. McPherson, Heather L. Reinsch, Dan H. Ball, James W. Erwin, David A. Dick, Thompson Coburn, LLP, St. Louis, for appellants.

Grant L. Davis, Thomas C, Jones, Scott S. Bethune, Timothy L. Brake, John S. Rollins, Robert H. Houske, Kansas City, Edward D. Robertson, Jr., Anthony L. Dewitt, Jefferson City, for respondents.

William A. Brasher, St. Louis, Louis P. Warchot, Daniel Saphire, Washington, D.C., amicus curiae Association of American Railroads.

Robert L, Pottroff, Norbert C. Marek, Jr., Manhattan, Mark E. Parrish, Independence, amicus curiae Railwatch and National Railroad Safety Coalition, Inc.

WOLFF, Judge.

## Introduction

Kimberly R. Alcorn was a passenger in a car driven by Curtis Edwards, which was hit by an Amtrak train at a railroad crossing on a county road south of Highway 50 between Warrensburg and Sedalia, Missouri. Union Pacific Railroad owned the tracks and crossing. Alcorn suffered serious, permanent injuries and sued Union Pacific Railroad, Amtrak,[1] Edwards, and the engineer operating the train, David Grimoldi.

Alcorn dismissed her claims against Grimoldi before trial, and the case was tried against the remaining three defendants. The jury found Union Pacific and Amtrak liable, attributing 75 percent fault to Union Pacific and 25 percent fault to Amtrak. The jury assessed no liability to Edwards. The verdict for compensatory damages was $40,366,517.59. The jury also found Union Pacific liable for punitive damages in the amount of $120,000,000. After defendants' post-trial motions, the trial court remitted the awards to $25,000,000 for compensatory damages and $50,000,000 for punitive damages.

Union Pacific and Amtrak filed their notices of appeal to this Court. The issues include whether Missouri's punitive damages extraction statute, section 537.675,[2] violates the United States and Missouri Constitutions. Because this case involves the validity of a statute, this Court has exclusive appellate jurisdiction. Mo.

---

1. National Railroad Passenger Corporation, d/b/a Amtrak.

2. All Missouri statutory citations are to RSMo 2000, unless otherwise noted.

Const. art. V, sec. 3; *see also Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 52–53 (Mo. banc 1999).

Union Pacific contends that section 389.610 preempts any common law duty to exercise due care with respect to warnings at railroad crossings and that the state regulatory agency had assumed jurisdiction over the crossing. Amtrak and Union Pacific also argue that Alcorn failed to make a submissible case as to negligence and causation. Accordingly, Union Pacific and Amtrak claim that, as a matter of law, they are not liable to Alcorn.

Union Pacific and Amtrak also assert evidentiary and instructional errors that, they claim, would warrant a new trial.

On the judgment for punitive damages, which was against Union Pacific only, the railroad contends that Alcorn failed to make a submissible case.

For reasons that follow, the judgment against Union Pacific and Amtrak for compensatory damages, as remitted by the trial court, is affirmed. Because this Court concludes that Alcorn failed to make a submissible case for punitive damages, the judgment for punitive damages is reversed.

### Facts [3]

Kimberly Alcorn was a passenger in a car driven by her boyfriend, Curtis Edwards, on August 29, 1997. At around 4:30 p.m. they were returning from Kansas City to their home in Sedalia. On Highway 50 just east of Warrensburg, Edwards drove his car into a ditch to avoid colliding with another vehicle. Alcorn apparently suffered a bruise on her arm. After this incident, Edwards decided to take back roads.

Edwards turned on to County Road 501. Edwards did not recall ever traveling on this road before. County Road 501 is a gravel road with some S-curves just south of Highway 50. Edwards drove the S-curves without incident and was going approximately 30 miles per hour on a straight section of the road. Edwards testified that he did not see any advance warning devices to indicate that his car was about to cross a set of railroad tracks. While Edwards said he had glanced at Alcorn's arm and was conversing with her while he was driving, he clearly testified that he was paying attention to his driving.

Edwards said that he did not hear the train's whistle, nor did he see the train before the crash. Edwards also did not recall seeing the railroad crossbucks, which is a sign in the shape of an "x" with the words "railroad" and "crossing."

The Amtrak train's crew, David Grimoldi, the engineer, and Kenneth Stoner, the assistant engineer, were operating the four-car passenger train en route from Kansas City to St. Louis as it approached County Road 501. The train was traveling east at maximum throttle, approximately 67 to 68 miles per hour. The day was hot, clear, and sunny. Stoner said he saw the approach of Edwards' car, as soon as it turned from Highway 50 onto County Road 501. Stoner described the approach of the car as being constant, at about 20 to 25 miles per hour, and that the car did not speed up or slow down. Stoner said that the car did not appear to be trying to speed up to beat the train, and he concluded that Edwards evidently did not see the train. Grimoldi also observed the car driving down County Road 501, estimating that he saw the car for at least 10 seconds before the train hit it. He, too, did not see Edwards' car speed up or slow down.

---

**3.** The facts are summarized in the light most     favorable to the verdict.

Stoner started sounding the train's emergency horn "quite a distance back from the crossing," because Edwards' car was approaching the crossing. However, the car continued to drive toward the crossing without slowing. After blowing the train's emergency horns, Grimoldi placed the train in emergency braking. The train hit the car's right rear quarter panel. The parties' experts dispute whether the train's emergency brakes were applied before or after the train hit Edwards' car. Alcorn's expert testified that the train was not placed into emergency braking until some 200 feet after the collision with Edwards' vehicle.

Other motorists, who had had close calls, or "near misses," with trains at the same railroad crossing, testified that there was difficulty both in seeing and hearing a train until it was very close to the crossing.

Grimoldi and Stoner testified as to previous incidents or close calls at the 501 crossing. Grimoldi was the engineer of an Amtrak train involved in a fatal accident at the 501 crossing in April 1997. While Grimoldi did not recall saying that the 501 crossing was dangerous, a state highway patrol officer testified that after the April 1997 crash, Grimoldi said that he believed the 501 crossing was dangerous. Stoner also said that he generally considered the 501 crossing to be dangerous, as he had had five or six close calls over the previous 10 years at this crossing.

Edwards returned to the scene of the crash four days later. When he came close to the tracks, he saw a crossbuck train warning sign, but it was propped up at an angle in a ditch. Edwards was able to see the crossbuck this time, because he was specifically looking for any indication that there were train tracks nearby.

There was considerable testimony concerning "sight distance obstructions" at the tracks' intersection with County Road 501. One expert said the view of a train would be "very, very obstructed by the northwest quadrant," which was the relevant quadrant in this case for the collision of a southbound car and an eastbound train. Although the crossing's northwest quadrant is the one most relevant to this collision, sight obstructions in one quadrant exacerbate sight problems in the other quadrants of a crossing, according to the experts.

This sight distance obstruction had been at the 501 crossing for quite some time before the collision. The tracks were somewhat obscured because the tracks were in a valley, some 23 feet below the level of the road. Moreover, because of the vegetation, a southbound motorist such as Edwards could not see the train tracks as he approached. The northwest quadrant did not have adequate sight distances to meet published standards of the United States Department of Transportation and the American Association of State Highway Transportation Officials.

At least five lay witnesses described various difficulties in seeing the trains, including obstructions caused by trees, brush and the sun, as well as the lay of the track. One witness said she had called Amtrak to report a close call and said that there was a need for lights and gates at the 501 crossing. Union Pacific had called a local concrete company to complain that its trucks were getting too close to the trains at the 501 crossing; the company's operation manager complained to someone at Union Pacific that the drivers could not see down the tracks to keep this from happening.

There was testimony that Union Pacific officials knew that the 501 crossing should have been equipped with gates and lights. Union Pacific was aware, for nearly a year before Alcorn's crash, of a sight distance

limitation of 90 percent at the 501 crossing for at least one of the quadrants. As early as September 1996, the 501 crossing was identified as needing improvement, and three months before the Alcorn collision the State of Missouri authorized the railroad to perform a preliminary engineering plan and cost estimate for the 501 crossing. Lights and gates at a crossing reduce the probability of crossing accidents by 90 percent, according to a Union Pacific representative.

As a result of the accident, Alcorn sustained substantial injuries. These included over 20 broken bones, significant blood loss, and a traumatic head injury. She went into cardiac arrest, spent over 40 days in the hospital, and lapsed into a coma for several days. Alcorn's vision has been diminished, she suffers from a permanent mood disorder and depression, she suffers chronic pain, her cognitive abilities have decreased, and she is unable to care for herself.

### Discussion

### Union Pacific's preemption claims

Union Pacific advances two arguments that Missouri statutes preempt any common law duty to exercise due care to protect the public at railroad crossings.

First, Union Pacific argues that section 389.610.4 vests "exclusive power" over railroad crossings with the division of motor carrier and railroad safety; therefore, Union Pacific has no independent legal duty

to evaluate a crossing to determine whether additional warning devices are needed.

Second, Union Pacific argues that the state had assumed jurisdiction over the 501 crossing, because the double-faced reflectorized crossbucks were either installed or maintained pursuant to an order or rule by the division of motor carrier and railroad safety. As such, the railroad argues that the warning devices are presumed adequate under section 389.614, and Union Pacific had no legal duty or authority to install additional warning devices at the crossing.

### A. There is no state law preemption of the railroad's common law duty to exercise due care

Union Pacific asserts that section 389.610.4 vests "exclusive power" over railroad crossings with the division of motor carrier and railroad safety;[4] thus, Union Pacific argues, it has no independent legal duty to evaluate a crossing to determine whether additional warning devices are needed. Contrary to Union Pacific's reading, the "exclusive power" provision has traditionally been interpreted to "supplement, not repeal existing law." *Clark v. Mississippi River & B.T. Ry.*, 324 Mo. 406, 23 S.W.2d 174, 177 (1929); *cf. Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 943 (Mo.App.1978).

■ Section 389.610.4 must be read with subsection 2 of section 389.610, which requires a railroad to "construct and maintain good and sufficient crossings."[5] Un-

---

4. Section 389.610.4 provides:

4. The division shall have the exclusive power to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, apportionment of expenses, use and warning devices of each crossing of a public road, street or highway by a railroad or street railroad, and of one railroad or street railroad by another railroad or

street railroad. In order to facilitate such determinations, the division may adopt pertinent provisions of The Manual on Uniform Traffic Control Devices for Streets and Highways or other national standards.

5. Section 389.610.2 provides:

2. Every railroad corporation shall construct and maintain good and sufficient crossings and crosswalks where its railroad

ion Pacific reads *"exclusive power"* out of context to mean that the division alone—to the exclusion of all others, including the railroad—is vested with the authority to determine whether certain railroad crossing warnings are required. The "exclusive power" of the division of motor carrier and railroad safety is to the exclusion of authority that might otherwise be exercised by municipal, county, Missouri Department of Transportation, or other authorities. *City of St. Louis v. St. Louis–San Francisco Ry. Co.*, 330 Mo. 499, 50 S.W.2d 637 (1932). Read in context, the statute ensures that there are "minimum standards" in the construction of a crossing and a single regulatory source for construction standards and allocation of costs .[6]

■ Nothing in the statute negates the railroad's common law duty to use reasonable care in providing adequate warning of railroad crossings. In fact, section 389.610.2 sets forth the duty by requiring the railroad to "construct and maintain good and sufficient crossings." While the statute provides a regulatory mechanism for ordering the upgrading of crossings, it does not supercede the railroad's common law duty. All that the statute provides is a presumption that such crossing protections, when built, will be presumed adequate. Section 389.614.[7]

"Where the legislature intends to preempt a common law claim, it must do so clearly." *Overcast v. Billings Mutual Ins. Co.*, 11 S.W.3d 62, 69 (Mo. banc 2000). If the General Assembly wanted to displace the railroad's common law duty to provide adequate warnings at its railroad crossing in chapter 389, it would have done so clearly. Instead the statute's language continues a duty to use reasonable care in constructing and maintaining "good and sufficient" crossings. Section 389.610.2.[8]

crosses public roads, highways, streets or sidewalks now or hereafter to be opened.

6. Union Pacific also argues that the division's adoption of Part VIII of the Manual on Uniform Control Devices—which states that, at a minimum, one reflectorized crossbuck sign "shall be used on each roadway approach to every grade crossing"—is additional support of the agency's "exclusive power" to direct what minimal requisite warning devices had to be installed and maintained at the 501 crossing. However, the regulation only "recommends" that the standards in Part VIII be applied in the *"installation* of all crossing warning systems in Missouri." 4 C.S.R. sec. 265–8.080(1) (emphasis added).

7. Section 389.614 provides:
Railroad warning devices, which are installed or maintained by order or by rule of the division of transportation, are presumed to be adequate and appropriate warning devices for the crossing. All railroads shall continue to exercise reasonable care at railroad crossings for the safety of the members of the public using the crossing.

8. *See also Nixon v. Hannibal & St. J.R. Co.*, 141 Mo. 425, 42 S.W. 942 (1897); *City of*

*Kirksville v. Hines*, 285 Mo. 233, 225 S.W. 950, 952 (1920); *State ex rel. Kansas City v. Public Service Commission*, 301 Mo. 179, 257 S.W. 462, 464 (1923); *Crockett v. City of Mexico*, 336 Mo. 145, 77 S.W.2d 464, 466 (1934); *Liddle v. Thompson*, 236 Mo.App. 1071, 162 S.W.2d 614, 619 (1942); *Patterson v. Thompson*, 277 S.W.2d 314, 317 (Mo.App.1955); *Hartmann v. St. Louis–San Francisco Ry. Co.*, 280 S.W.2d 442, 446 (Mo.App.1955); *Coon v. Atchison, Topeka & Santa Fe*, 826 S.W.2d 66 (Mo.App.1992); *cf. Mott v. Missouri Pacific R.R.*, 926 S.W.2d 81, 85 (Mo.App.1996). There are also several other jurisdictions that have statutes similar to section 389.610.4 RSMo, and courts in those states have also rejected the railroad's "no duty" argument. *See, e.g., Birmingham v. Union Pacific R.R. Co.*, 971 F.Supp. 1282, 1287–88 (E.D.Ark. 1997); *St. Louis–San Francisco Ry. Co. v. Wheeler*, 108 Okla. 139, 235 P. 498 (1925); *Lloyd v. Southern Pacific Co.*, 111 Cal.App.2d 626, 245 P.2d 583 (1952); *Pobor v. Western Pac. R.R. Co.*, 55 Cal.2d 314, 11 Cal.Rptr. 106, 359 P.2d 474 (1961); *Canion v. Southern Pac. Co.*, 52 Ariz. 245, 80 P.2d 397 (1938); *Gleave v. Denver & Rio Grande Western R.R. Co.*, 749 P.2d 660 (Utah Ct.App.1988), *cert. Denied,*

■ The fact that the State of Missouri, either on its own, through agency decision, or through programs sponsored by the federal government such as the grade crossing safety program, has sought to identify hazards and prioritize improvement projects does not negate the railroad's duty.[9] *See Pierce v. Platte–Clay Elect. Coop., Inc.*, 769 S.W.2d 769, 772 (Mo. banc 1991). The question of preemption is answered by the language of the statute itself. In the circumstances of this case, there was no preemption.

**B. The state had not assumed jurisdiction over the 501 crossing**

Union Pacific argues that, under section 389.614, the state had assumed jurisdiction over the 501 crossing; therefore, the railroad had no duty to exercise reasonable care because it was the state's responsibility. Section 389.614 says that "warning devices, which are installed or maintained by order or rule of the division, are presumed to be adequate and appropriate...."

■ Until the division of motor carrier and railroad safety assumes jurisdiction with respect to this particular crossing, and has made an order with respect to the crossing, the railroad's common law duty to use due care remains. *Cf. Clark*, 23 S.W.2d at 177; *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 943 (Mo.

App.1978); *Thomas v. Chicago, R.I. & P Ry.*, 271 S.W. 862, 865 (Mo.App.1925); *Mott v. Missouri Pacific R.R.*, 926 S.W.2d 81, 85 (Mo.App.1996).

■ The burden is on the railroad to show that the state agency has assumed jurisdiction by a particular order. *Clark*, 23 S.W.2d at 177. Union Pacific argues that pursuant to an application from the state highway commission, the Missouri public service commission[10] issued an order on August 1, 1979, requiring the installation of two double-face, reflectorized crossbuck warning signs at Missouri Pacific's[11] public roadway crossings within the state where such installation was possible and where such signs did not already exist. While the railroad conceded that it did not have direct proof that the reflectorized crossbucks at the County Road 501 crossing were installed pursuant to the 1979 commission order, it said that these crossbucks were exactly the type required by the order and were at the crossing by 1982.

Union Pacific fails to show that the state agency has assumed jurisdiction over the 501 crossing. First, there is no order in the record concerning the installation of warning signs at the 501 crossing. Second, Union Pacific's assertion that these crossbucks were maintained pursuant to the 1979 commission order is without mer-

765 P.2d 1278 (Utah 1988); *Kurz v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 53 Wis.2d 12, 192 N.W.2d 97 (1971); *Baker v. Norfolk & Western Ry. Co.*, 120 Ill.App.2d 296, 256 N.E.2d 887 (1970); *Koch v. Southern Pac. Transp. Co.*, 274 Or. 499, 547 P.2d 589 (1976).

9. "What the states cannot do—once they have installed federally funded devices at a particular crossing—is hold the railroad liable for the adequacy of those devices." *Norfolk Southern Ry. Co. v. Shanklin*, 529 U.S. 344, 358, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000). The Court makes it clear that there is no distinction between devices installed for

"minimum protection" and those installed under a so-called "priority" or "hazard" program. *Id.* at 356, 120 S.Ct. 1467. This holding only applies to warning devices "actually installed with federal funds" pursuant to 23 C.F.R. sec. 646.214(b)(3) or (4) (1999). *Id.* at 354, 120 S.Ct. 1467.

10. The public service commission is the predecessor of the division of motor carrier and railroad safety as to railroad crossings.

11. Missouri Pacific is the predecessor to Union Pacific.

it, because a review of that order shows that its purpose was the installation of "two reflectorized crossbuck signs at every public highway railroad crossing of the railroad's line ... where such protection is not already in place, provided such installation is physically possible." There is nothing in the order regarding further maintenance of warning signs not part of the order. Third, the order itself specifically states that the purpose of installing the reflectorized crossbuck is to provide "minimum protection" and that the "application does not affect those crossings in the state which may warrant the installation of additional protection devices."

This 1979 order cannot be construed to preempt a common law duty when it specifically proclaims that it does not affect those crossings where additional warning devices may be needed.

Union Pacific also argues that the state had assumed jurisdiction by the state's diagnostic inspection at the 501 crossing on September 18, 1996. The railroad argues that the state, exercising its "exclusive power," concluded that additional devices might be appropriate based on a finding of a 90 percent sight obstruction. The state authorized the railroad to begin preliminary engineering work for the installation of gates and warning lights on May 9, 1997, which was shortly after the fatal accident at the crossing in April 1997. By the state's letter authorizing preliminary engineering work, Union Pacific argues the state assumed jurisdiction over the 501 crossing, and the railroad was actively participating and complying with the timetable required by the state.

However, neither the 1996 diagnostic inspection nor the state's letter to Union Pacific authorizing it to begin preliminary engineering to produce a plan and cost estimate is an order or rule of the division of motor carrier and railroad safety.

Moreover, until the crossing devices are actually installed, pursuant to an order or rule, the presumption of adequacy in section 389.614 does not apply.

As the second sentence of section 389.614 clearly states: "All railroads shall continue to exercise reasonable care at railroad crossings for the safety of the members of the public using the crossing." The continuation of the common law duty to maintain safe crossings fits the statutory purpose because it accounts for changes in crossings that may not come to the attention of regulators. These changes could include, for example, a change in vegetation and other sight obstructions, the type and frequency of trains regularly going over the crossing, or a change in the type or numbers of vehicles using the crossing. *See, e.g., Baldwin v. Atchison, Topeka & Santa Fe*, 425 S.W.2d 905, 907 (Mo.1968); *cf. City of Kansas City v. Kansas City Belt Ry. Corp.*, 102 Mo. 633, 14 S.W. 808, 809 (1968). If the railroad becomes aware that a particular crossing is dangerous, it has a duty to exercise reasonable care to protect persons using the crossing. *Cf. Koehler*, 573 S.W.2d at 943.

**Union Pacific had notice that the County Road 501 crossing was hazardous and there was evidence sufficient for the jury to find that the accident was caused by the railroad's failure to provide adequate warning devices**

Even if Alcorn's negligence claim is not preempted, the railroad argues that she still failed to prove that the railroad had actual or constructive knowledge that the 501 crossing was unusually hazardous because of alleged sight deficiencies in the northwest quadrant of the crossing or that any such breach of an alleged duty was the cause of the collision. Union Pacific also argues that, given the need to obtain state approval to install additional warning de-

vices, the railroad could not have installed such devices before her accident on August 29, 1997; thus, the claimed breach of duty was not a proximate cause of her injuries.

### A. Union Pacific's duty

■ Union Pacific's argument is focused on whether it breached its duty of care and, specifically, whether the risk of harm was foreseeable. *See Lopez v. Three Rivers Elec. Coop.*, 26 S.W.3d 151, 155 (Mo. banc 2000). The breach of the duty of care is a question of fact, which is normally an issue for the jury to decide. *Crane v. Drake*, 961 S.W.2d 897, 901 (Mo. App.1998). The foreseeability question is whether the defendant should have foreseen the type of harm that in fact occurred and whether the plaintiff was within the class of persons to whom such harm might foreseeably happen. 1 DAN B. DOBBS, THE LAW OF TORTS sec. 182 (2001); *see also Lopez*, 26 S.W.3d at 156. For purposes of duty, and to determine whether Alcorn made a submissible case, the question is whether Union Pacific should have foreseen the risk of danger and whether motorists driving south on County Road 501 were within the class of persons to whom such harm might foreseeably occur.

Union Pacific asserts, contrary to the evidence, that it did not have actual or constructive knowledge that the crossing was unusually dangerous from the northwest quadrant. The railroad points out that the only previous accident at the crossing—the fatal accident in April of 1997—involved the southeast quadrant of the crossing, that is, a northbound motorist and a westbound train. Further, Union Pacific asserts that none of the other purported incidents or close calls were identified as involving southbound motorists and an eastbound train—as Alcorn's collision did. The railroad ignores evidence that the crossing was dangerous for motorists from either direction, and that Union Pa-

cific knew or should have known of that condition.

■ Union Pacific's argument is not only contrary to evidence that supports the verdict, but is unduly restrictive. A defendant is liable for harm he negligently causes "so long as a reasonable person in his position should have recognized or foreseen the general kind of harm the plaintiff suffered." DOBBS, *supra*, sec. 189; *see also Pierce v. Platte–Clay Elec. Co-op.*, 769 S.W.2d 769, 776 (Mo. banc 1989). A defendant is not relieved of liability merely because the precise manner in which the injury occurred or its details were unforeseeable. *Pierce*, 769 S.W.2d at 776.

There was ample evidence of sight limitations at the 501 crossing, which is certainly a general type of harm, and the jury could have concluded that Union Pacific had actual or constructive notice that the crossing was unusually hazardous. In addition to Union Pacific's actual knowledge of the April 1997 fatal accident, a representative of Union Pacific reportedly contacted the manager of a concrete plant that is near the 501 crossing concerning the concrete mixer trucks getting too close to the trains. During that conversation the manager of the concrete plant told Union Pacific that there was a problem seeing trains coming down the tracks. There was testimony that there was a 90 percent sight distance obstruction, which Union Pacific knew about at least by September 1996. Although the evidence of danger to northbound motorists may be stronger than evidence of danger to southbound vehicles, from the evidence presented it was foreseeable that motorists coming from either direction were at risk of harm.

This risk of harm was foreseeable well before Alcorn's collision. Alcorn was in the class of persons to whom such harm

could occur. As such, the evidence here is sufficient to support submission of the negligence claim to the jury.

### B. Whether lack of adequate warnings caused the accident

■ Union Pacific argues that Alcorn failed to establish a causal connection between its alleged negligence and the injuries she sustained.

■ The question of whether an injury in fact was caused by negligence is for the jury. *Stroot v. Taco Bell Corp.*, 972 S.W.2d 447, 449 (Mo.App.1998); *see also* Dobbs, *supra*, sec. 182. The issue, when addressed by the court as a matter of law, is phrased in terms of proximate cause. This Court examines proximate cause to determine "whether an injury is the natural and probable consequence of the defendant's negligence." *Stanley v. City of Independence*, 995 S.W.2d 485, 488 (Mo. banc 1999). "Proximate cause cannot be based on pure speculation and conjecture ." *Id.* As this Court explained in *Callahan v. Cardinal Glennon Hospital*, 863 S.W.2d 852, 853, 865 (Mo. banc 1993), "Proximate cause requires something in addition to a 'but for' causation test" to exclude causes upon which it would be "unreasonable to base liability upon because they are too far removed from the ultimate injury or damage." An element of this examination is foreseeability, but with the advantage of hindsight. *Id.* As to proximate cause, "foreseeability refers to whether a defendant could have anticipated a particular chain of events that resulted in injury or the scope of the risk that the defendant should have foreseen." *Lopez*, 26 S.W.3d

at 156. It is not necessary that a defendant anticipate "the very injury complained of or anticipated that it would have happened in the exact manner that it did." *Callahan*, 863 S.W.2d at 865 (quoting *Tharp v. Monsees*, 327 S.W.2d 889, 894 (Mo. banc 1959)). "All that is necessary is that he [the defendant] knew or ought to have known that there was an appreciable chance that some injury would result." *Id.*

■ Put simply, this Court's inquiry is whether there are sufficient facts to show that an injury is "the natural and probable consequence of the defendant's negligence" in order to make a submissible case. *Stanley*, 995 S.W.2d at 488.

Union Pacific claims that Edwards' inattention caused the collision, not the sight problems at the crossing. However, Union Pacific in effect asks this Court to ignore or discount Edwards' unequivocal testimony, and the jury's apparent acceptance of it, that he was paying attention when he was driving down County Road 501.

Despite the efforts of the Union Pacific and Amtrak to blame Edwards, the jury assessed zero fault to him.[12] The evidence here was sufficient for the jury to conclude that the lack of adequate warnings at the 501 crossing was a major cause in fact of the accident.

### C. Union Pacific's duty to use reasonable care was not affected by the time necessary to obtain state approval to upgrade the crossing

■ Union Pacific argues that Alcorn failed to show that it could have installed

---

12. Because there was evidence to support the jury's verdict that Edwards did not cause the collision, it is not necessary to address whether Amtrak and Union Pacific can challenge the judgment in favor of Edwards. Co-defendants arguably are bound by a judgment in favor of another co-defendant, in the absence of a cross claim for indemnity or contribution. *See* Restatement (Second) of Judgments sec. 64 cmt. b (1982). In any event, Union Pacific and Amtrak do not directly attempt to challenge the jury's assessment of zero fault to Edwards.

additional warning devices before the Alcorn collision on August 29, 1997, and without this showing Alcorn failed to prove that the claimed breach of duty was a cause of her injuries.

There was evidence that Union Pacific had ample notice of the hazardous nature of the crossing in sufficient time to allow installation of appropriate warnings. There is no basis in this record for negating the jury's determination that the failure to install appropriate warnings was a cause of Alcorn's injuries.

Union Pacific had notice of the danger presented by the crossing no later than September 1996. Furthermore, Union Pacific had notice of previous close calls, the April 1997 fatality, and notice from the State of Missouri requiring active warning devices at the 501 crossing. Moreover, a Union Pacific representative testified that it was possible to upgrade crossings using its own funds, without state or federal funds, and the appropriate approvals would be granted.

The evidence supports the jury's finding as to causation.

**D. The jury instruction did not give the jury a roving commission to find Union Pacific liable**

■ Union Pacific also argues that the verdict-directing jury instruction, which was a modified MAI, gave the jury a "roving commission." Specifically, Union Pacific complains that the instruction did not provide the jury any factual guidelines to determine whether Union Pacific acted negligently, and this permitted the jury to hold the railroad liable based on a finding that it failed to warn motorists of "inadequate sight distance" at the crossing, or failed to warn motorists that the crossing was "unusually hazardous," or because it failed to install flashing lights and gates. Union Pacific argues that the instruction

allowed the jury to find the railroad negligent based upon a variety of unidentified factors, which was prejudicially erroneous and should require the granting of a new trial.

The verdict-directing instruction is as follows:

On the claim of plaintiff Kimberly Alcorn for compensatory damages for personal injury against defendant Union Pacific Railroad Company, your verdict must be for plaintiff Kimberly Alcorn if you believe:

First, the crossing was unusually hazardous because it did not afford southbound motorists adequate sight distance to observe trains approaching the crossing from the west, and

Second, defendant Union Pacific Railroad Company knew or by using ordinary care should have known of this condition, and

Third, defendant Union Pacific Railroad Company failed to use ordinary care to warn of such condition, and

Fourth, such failure directly caused or contributed to cause damage to plaintiff.

The instruction is a modified MAI 22.02 verdict director, based in part on *Lohmann v. Norfolk & Western Ry. Co.,* 948 S.W.2d 659 (Mo.App.1997). In *Lohmann,* the railroad defendant contended that the trial court's instruction erred in not specifying the type of warning the railroad failed to provide and the reasons the crossing was "unusually hazardous;" therefore, the railroad argued, the jury was allowed improperly to speculate on these issues. *Id.* at 666. While the *Lohmann* defendant's objections were not properly preserved for appeal, the court said that the jury need not determine what particular means the railroad should have used to protect persons using their crossing, but is to determine whether, under the given cir-

cumstances, the means used were sufficient to constitute due care. *Id.* at 667. The court also said that a limiting instruction might have been the only practical way of addressing the defendant's concern about a "roving commission." *Id.*

■ The use of an MAI jury instruction, properly modified for a particular case, contemplates that the jury will be properly advised by the argument of counsel concerning details. *See Bayne v. Jenkins,* 593 S.W.2d 519, 531 (Mo. banc 1980). Under the guidance of Rule 70.02(b),[13] the trial court is to submit only ultimate factual issues to the jury, avoiding evidentiary detail that might otherwise confuse the issues. *Koehler,* 573 S.W.2d at 944.

The verdict director complies with Rule 70.02(b), because it is brief and does not require the jury to find detailed evidentiary facts. As suggested in *Lohmann,* the railroad defendants were permitted to give three limiting instructions, which the trial court believed would provide additional assurances that the jury was not given a "roving commission."[14] The trial court did not err.

## Alcorn's negligence claim against Amtrak

### A. There is no federal preemption of Alcorn's claim because it involves a specific, individual or local hazard

■ Amtrak contends that the verdict against Amtrak is based on the train's speed, a claim that is preempted by federal law. The Amtrak train was traveling below the maximum speed permitted by federal regulations for that portion of the track at the time of the accident.[15]

The United States Supreme Court has ruled that while some claims based on dangerous conditions are permissible, federal law preempts state common law claims based merely on excessive speed. *CSX Transportation, Inc. v. Easterwood,* 507 U.S. 658, 675, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993); *see also Barlett v. Kansas City Southern Ry. Co.,* 854 S.W.2d 396, 399 (Mo. banc 1993). However, *Easterwood* did not preempt a common law claim based on the duty of a train's crew to slow down or stop where a specific, individual hazard exists. *Barlett,* 854 S.W.2d at 399. The trial court's instructions here

13. Rule 70.02(b) states in part:

Where an MAI must be modified to fairly submit the issues in a particular case, or where there is no applicable MAI so that an instruction not in MAI must be given, *then such modifications or such instructions shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts.* (Emphasis added.)

14. The limiting or withdrawal instructions were as follows:

Instruction number 15: The evidence of flagmen and slow train orders is withdrawn from the case and you are not to consider such evidence in arriving at your verdict.

Instruction number 16: The speed of the train in this case is governed by federal regulations. You are instructed that the train in this case was operating within that speed limit. The only claim you can consider against defendant Amtrak is contained in Instruction No. 9.

Instruction number 17: You are instructed that Defendant Union Pacific Railroad Company is only required to keep its right-of-way clear of vegetation, undergrowth or other debris for a distance of 250 feet each way from the near edge of a public grade crossing where such things would materially obscure approaching trains from the view of travelers on the highway.

15. The Amtrak train was traveling at about 67 or 68 miles per hour just before the collision with Edwards' vehicle. The record also indicates that the track running through the 501 crossing is a Class 4 track under federal regulation 49 C.F.R. sec. 213.9(a), and that the maximum allowable operating speed for a passenger train on such track is 80 miles per hour.

specifically excluded a claim based on speed.[16]

The facts support the jury's conclusion that the train crew knew or should have known, by reason of Edwards' "unwavering approach," that a collision was imminent. Both Grimoldi and Stoner, the Amtrak engineers, saw Edwards' vehicle approaching the 501 crossing and saw that the car was neither speeding up nor slowing down. Grimoldi and Stoner knew that the crossing was dangerous, based on previous close encounters, as well as the April 1997 fatality several months earlier. Though Stoner had begun to sound short blasts on the emergency horn, Grimoldi did not slacken speed. The question is whether an unwavering approach of a vehicle toward this crossing was a specific, individual hazard.

Cases that recognize an exception to the federal preemption based on a "specific, individual hazard" include, *Bashir v. National Railroad Passenger Corp.*, 929 F.Supp. 404, 412 (S.D.Fla.1996) (no preemption where a child was standing on a track); *Shaup v. Frederickson*, 1998 WL 726650 (E.D.Pa.1998) (no preemption where train failed to slow after seeing plaintiff's car stranded on track); *Florida East Coast Railway Co. v. Griffin*, 566 So.2d 1321 (Fla.App.1990) (no preemption where teenage child was hit by train while attempting to cross tracks on way home from school); *Central Georgia R.R. Co. v. Markert*, 200 Ga.App. 851, 410 S.E.2d 437 (1991) (imminent collision with car crossing track). On the other hand, cases that involve warning devices, grade, angle, and proximity to highways are all general conditions that are amenable to uniform, national standards and are, therefore, preempted. *O'Bannon v. Union Pacific R.R. Co.*, 960 F.Supp. 1411, 1421 (W.D.Mo. 1997); *Stevenson v. Union Pacific Rail-*

*road Co.*, 110 F.Supp.2d 1086 (E.D.Ark. 2000).

At least one court postulated an example of an "obvious case," somewhat similar to the facts here, of an individual hazard where an engineer sees a stranded motorist on a crossing, but negligently fails to stop or slow the train to avoid the collision. *Herriman v. Conrail Inc.*, 883 F.Supp. 303, 307 (N.D.Ind.1995). A specific, individual hazard can include the "unwavering approach" of a vehicle that the train crew either knew or should have known about. *Griffin v. Kansas City Southern Ry. Co.*, 965 S.W.2d 458, 461 (Mo.App.1998).

Under these cases, an unwavering approach by a vehicle at a railroad crossing, where the engineers knew or should have known that a collision was imminent, is a specific, identifiable hazard. Such a hazard requires the train's crew either to slow the train or stop, in addition to any other preventive measures it can take, to avoid the collision. Such a situation is *not* encompassed in or accounted for in federal regulations governing maximum operation train speed. Accordingly, Alcorn's claim against Amtrak is not preempted.

**B. The negligence instruction as to Amtrak was not erroneous**

■ Amtrak argues that the second paragraph of the verdict-directing instruction as to Amtrak is based on the faulty premise that the unwavering approach of a vehicle is an indication that a collision is imminent, which, by itself, imposes a duty on a train crew to slacken its speed as the train approaches the crossing. The challenged portion of the instruction is as follows:

Second, that the train crew knew or by the use of ordinary care could have known that by reason of such unwaver-

16. See Instruction number 16 quoted in footnote 14.

ing approach that a collision was imminent, in time thereafter to have slackened the train's speed, but the train crew failed to do so,.... [17]

Among other things, Amtrak argues that a railroad cannot be held liable for failing to slow down simply because a car was approaching. It also argues that an engineer who sees a vehicle approaching has the right to assume the driver will stop before going on the track unless there is something in the driver's actions or manner to indicate otherwise.[18]

This instruction did not permit the jury to render a verdict for the plaintiff merely based on speed. Instead, it required the jury to find that Edwards' approach was unwavering, which, as discussed above, can be a specific, individual hazard. It also required the jury to find that the train crew could have braked in sufficient time to avoid the collision but failed to do so. The instruction is not erroneous.

## C. The failure of Amtrak engineers to slacken speed was a cause of Alcorn's injuries

■ Amtrak argues that Alcorn failed to prove that any failure of the train's crew to slow down sooner caused the accident, and that the train crew had a duty to slow down only when they knew a collision was imminent—that is, only when it was apparent that Edwards could not stop his vehicle before reaching the crossing.

In short, Amtrak argues that the train could not have been stopped before it reached the crossing; thus, it is irrelevant that the train crew did not slacken speed immediately because it would not have made a difference given that the train could not have stopped, even under the most generous calculation. This argument, however, ignores the evidence in the light most favorable to the verdict. Alcorn's expert testified that had the train's crew merely braked or reduced the throttle—without placing the train into emer-

17. The verdict-directing instruction as to Amtrak was:

On the claim of plaintiff Kimberly Alcorn for compensatory damages for personal injury against defendant National Railroad Passenger Corporation d/b/a Amtrak your verdict must be for plaintiff Kimberly Alcorn if you believe:

First, that the approach of defendant Edwards' vehicle to the crossing was unwavering, and

Second, that the train crew knew or by the use of ordinary care could have known that by reason of such unwavering approach that a collision was imminent, in time thereafter to have slackened the train's speed, but the train crew failed to do so, and

Third, the train crew was thereby negligent, and

Fourth, such negligence directly caused or directly contributed to cause damage to plaintiff.

18. Amtrak cites *Pipes v. Missouri Pac. R.R. Co.*, 338 S.W.2d 30, 35 (Mo.1960), which says that a driver must exercise the highest degree of care when approaching the track. The judgment against the railroad in *Pipes* was reversed due to the plaintiff's contributory negligence—an all or nothing approach—which has since been replaced by comparative fault. Amtrak also cites *See v. Wabash R.R. Co.*, 259 S.W.2d 828, 831 (Mo.1953), in which this Court upheld an instruction to the jury that the defendant railroad and engineer "had a right to assume that a ... [motor vehicle] approaching the crossing would stop before going upon a crossing into danger of being struck by a train, and said defendants were under no duty to signal or slacken speed until they saw or should have seen that the truck would not stop and was in a position of danger." This portion of *See* supports Alcorn's instruction. And unlike *See*, where the driver stopped his truck just short of the tracks and then started up again, pulling in front of the train, it was Edwards' lack of speeding up or slowing down that indicated that Edwards was oblivious to the fast approaching train.

gency braking—it would have made a difference on the train's arrival time at the 501 crossing. Alcorn's expert testified that if the train's emergency brake had been applied when the emergency began to unfold, that is, when Stoner started hitting the emergency horn, it is likely that there would have been sufficient time for Edwards' vehicle to clear the crossing without being struck in the rear quarter. The Alcorn car, according to expert testimony, needed less than a second to clear the crossing and avoid the collision. There is sufficient evidence to support the jury's conclusion that the failure of the train crew to employ its emergency brake or slacken speed in a timely manner caused Alcorn's injuries.

**The evidence of the close calls at the 501 crossing**

■ Alcorn introduced evidence that there had been a prior accident and several "near misses" at the 501 crossing—to show notice to Union Pacific and Amtrak that the crossing was unusually dangerous. Some of this evidence, particularly the previous accident in April 1997, was relied upon by plaintiff's expert, Dr. Kenneth Wayne Heathington, who testified that the crossing was unusually hazardous. Union Pacific and Amtrak contend evidence of the prior accident and "near misses" at the County Road 501 crossing was not sufficiently similar to Alcorn's accident to meet the foundation for admissibility.

■ Trial courts are given wide discretion on admission of evidence of similar occurrences. *Lopez*, 26 S.W.3d at 159–60. The trial court must satisfy itself that the evidence was relevant and that the evidence of such occurrences sufficiently resembled the injury-causing incident. The trial court must weigh the possibility of undue prejudice or confusion of issues. *Id.* The trial court's discretion is guided by *Stacy v. Truman Medical Center,* 836

S.W.2d 911, 926 (Mo. banc 1992), where this Court held that "any knowledge or warning that the defendant had of the type of accident in which plaintiff was injured clearly aids the jury in determining whether a reasonably careful defendant would have taken further precautions...." *See also Emery v. Wal–Mart Stores, Inc.* 976 S.W.2d 439, 446 (Mo. banc 1998). Previous incidents need only be such as to call defendants' attention to the dangerous situation. *Stacy,* 836 S.W.2d at 926 (quoting with approval McCORMICK ON EVIDENCE, sec. 200 at 848 (4th ed.1992)).

Evidence of the April 1997 accident and the previous "near misses" was relevant to show notice to both Union Pacific and Amtrak of the unusually hazardous condition of the 501 crossing. The jury appropriately was not told that the April 1997 collision was a fatality, thus eliminating its potential inflammatory impact and confining its use to notice. The trial court did not abuse its discretion in allowing plaintiff to present evidence of the previous prior accident and "near misses."

**Plaintiff's expert testimony and computer calculations regarding stopping distances for the Amtrak train**

■ Alcorn presented expert testimony from Jimmy Scott on where the Amtrak train was placed into emergency stop. Scott opined that the train was not braked until approximately 200 feet after the collision at the crossing.

Scott's testimony contradicted Grimoldi and Stoner, both of whom said the train was placed into emergency stop before reaching the crossing.

Scott testified about his use of a computer simulation at the Illinois Institute of Technology in Chicago to determine a stop distance of the Amtrak train in question. The simulation was used to assist in presenting Scott's opinion.

Amtrak argues that there was inadequate foundation to allow Scott's testimony about the use of the computer simulation to support his opinion on the train's stop distance. Specifically, Amtrak says there was no evidence that the computer program was properly authenticated and was functioning properly; that Scott's own testimony showed that the facts upon which the simulation was based were incorrect; and that there was no evidence showing that the computer program was generally accepted by the community of scientists in the field of accident reconstruction.

■ A computer simulation is similar to evidence of experiment. "[E]xperimental evidence is admissible when the experiment was made under conditions substantially similar in essential particulars to the condition which prevailed at the time of the occurrence in the suit, and ... the conditions need not be identical." *Blevins v. Cushman Motors,* 551 S.W.2d 602, 610 (Mo. banc 1977).[19] The trial court has substantial discretion to admit experimental evidence. *Id.*

■ Missouri courts have not established specific foundational requirements for computer-generated evidence, *Bray v. Bi–State Development Corp.,* 949 S.W.2d 93, 97 (Mo.App.1997),[20] but review the evidence on a case-by-case basis to determine whether a sufficient foundation was laid that, if believed by the finder of fact, supports the conclusions. However, the question the trial court must consider is whether the experiment, test, or simulation will aid the jury in deciding the issues of the case. This is the same standard as for expert testimony. Section 490.065.

There was a considerable foundation. The Illinois Institute of Technology simulator has been used by the National Transportation Safety Board, the Federal Railroad Safety Commission, and other government bodies. The simulator had been used for training Amtrak and Union Pacific engineers and used by both railroads for accident investigation. Scott testified as to the information necessary for a proper train simulation. The information in the simulator originated from a file submitted by the Association of American Railroads of which Union Pacific and Amtrak are members. The simulator is reasonably relied on by professionals in the field.

■ The information that was provided to yield Scott's calculation on where the train's brakes were first applied was subject to cross-examination: Scott testified that he obtained the information from various sources, including the police report describing the collision, which, among other things, described how many axles were on the locomotive in question and how many feet past the crossing the train made its final stop. While Amtrak complains that the information that Scott used was erroneous, Scott testified that he used fig-

19. *See also* WILLIAM A. SCHROEDER, 23 MISSOURI PRACTICE· MISSOURI EVIDENCE sec. 1105.1(b) (2d ed.2000); JOHN C. O'BRIEN, MISSOURI LAW OF EVIDENCE sec. 9–17 (3d ed.1996).

20. In *Bray,* the court of appeals examined three guidelines, set forth by the Massachusetts Supreme Court in *Commercial Union v.. Boston Edison,* 412 Mass. 545, 591 N.E.2d 165, 168 (1992), to establish a foundation to authenticate computer-generated evidence: "(1) The computer is functioning properly; (2) The input and underlying equations are sufficiently complete and accurate (and disclosed to the opposing party, so that they may challenge them); (3) The program is generally accepted by the appropriate community of scientists." 949 S.W.2d at 97. While the court acknowledged that *Commercial Union* provides a helpful starting point to analyze questions of sufficiency of foundation, it did not adopt these guidelines or otherwise attempt to set forth a formula or fixed set of guidelines. 949 S.W.2d at 99.

ures that would give Amtrak the benefit of the doubt in stop distances. Such variances that are more detrimental to the proponent of the test than those that existed in the original will not bar the admission of such evidence. *Lawson v. Schumacher & Blum Chevrolet, Inc.*, 687 S.W.2d 947, 954 (Mo.App.1985). In *Carpenter v. Kurn*, 348 Mo. 1132, 157 S.W.2d 213, 215 (1941), this Court said that where an experiment was made under similar or approximately similar circumstances, any dissimilarity goes to weight and not admissibility. Scott testified that the information he had concerning the type of locomotive, the cars, and the braking ratios was accurate, and his testimony was subject to cross-examination.

■ While Amtrak disputes Scott's figures—some that were provided by Amtrak itself—the proper place to make this dispute is in the trial court. The record shows that this was done, as there were numerous objections and discussions between both parties and the judge. Simply because experts disagree is not reason to disallow the evidence. As the trial court noted, this is one of the purposes of cross-examination. Any weakness in the factual underpinnings of the expert's opinion or in the expert's knowledge goes to the weight that testimony should be given and not its admissibility. WILLIAM A. SCHROEDER, 22A MISSOURI PRACTICE: MISSOURI EVIDENCE sec. 703(a) (2d ed.2000). In general, the expert's opinion will be admissible, unless the expert's information is so slight as to render the opinion fundamentally unsupported. *Id.*

Testimony that is based upon or bolstered by a computer simulation can have a powerful effect, but the proponent of such evidence runs a risk that effective cross-examination or other evidence casting doubt on the factual premises can damage the credibility of the computer-assist-

ed evidence. The computer-age adage, "garbage in, garbage out," applies. Union Pacific and Amtrak had every opportunity to discredit the evidence. There was no error or abuse of discretion by the trial judge.

## Allegations of juror misconduct and nondisclosure

■ Union Pacific and Amtrak contend that the trial court erred in denying their motion for a new trial based on the misconduct of two jurors, Lynch and Brock. After a hearing on the issues of juror misconduct and nondisclosure, the trial court found that there was no prejudice from the jurors' conduct and refused to grant a new trial. The findings of the trial court in ruling on a motion for a new trial based on juror misconduct are given great weight and will not be disturbed on appeal unless the trial court abused its discretion. *Brines v. Cibis*, 882 S.W.2d 138, 139 (Mo. banc 1994).

### A. Juror Lynch's alleged concealment of prior litigation

■ Appellants assert that juror Lynch failed to disclose, during *voir dire* examination, her involvement as a defendant in a collection lawsuit. Both counsel and the trial court asked the prospective jurors, which included Lynch, whether they had ever been named as a defendant in a lawsuit. During the *voir dire*, juror Lynch did disclose her involvement in two previous lawsuits, including one that was more than 19 years old. However, she did not disclose that she signed a consent judgment on August 16, 1999, for $3,130.61 plus court costs, in a collection matter. But Lynch was not formally served with a lawsuit until September 18, 1999, approximately three weeks after the conclusion of the *voir dire*. At a post-trial hearing, Lynch testified that she had believe that signing the consent judgment meant that

the matter was over and that there was not going to be a lawsuit.

The trial court found that because Lynch was not yet a defendant in a lawsuit at the time of the *voir dire*, she was not required to disclose that she was settling a contract dispute prior to its being filed as a lawsuit. The court also found that based on Lynch's candor in disclosing her involvement in two other matters, assuming *arguendo* that she needed to disclose the matter in question, such nondisclosure was unintentional. While the court said the nondisclosure was material—since it involved prior litigation—the actions were so different that it found no prejudice. *See Williams v. Barnes Hosp.*, 736 S.W.2d 33, 37 (Mo. banc 1987). The trial court did not abuse its discretion.

**B. Juror Brock's improper visit to the accident scene after the jury had returned a verdict finding Union Pacific liable for punitive damages**

After the jury had returned a verdict for compensatory damages and a verdict finding Union Pacific liable for punitive damages, but before any deliberations on the amount of punitive damages, Juror Brock visited the scene of the accident. The trial judge had previously admonished the jury not to do so. The trial court was "troubled" by Brock's behavior, but believed it was the product of inattention rather than intentional misconduct. The court found that there was no prejudice to the verdict for compensatory damages or the verdict that punitive damages should be assessed. This was because the timing of Brock's visit—after the verdicts were rendered in the phase of the trial dealing with negligence, compensatory damages and liability for punitive damages—obviously did not affect these verdicts. As to the amount of the punitive damages, the trial court found that a new trial would be an inappropriate cure, where the court could cure any such problem through its remittitur review of punitive damages.

■ It was inappropriate for Brock to visit the scene on his own until his duties as a juror were discharged. However, since Alcorn failed to make a submissible case for punitive damages, it is unnecessary to reach this issue.

There is no basis for disturbing the trial court's finding that Brock's visit had no effect on the verdicts for compensatory damages and for liability for punitive damages.

**Alcorn failed to make a submissible case for punitive damages**

■ Submission of a punitive damages claim to the jury warrants special judicial scrutiny because the instructional standards for punitive damages are necessarily general. *See Honda Motor Co. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994); *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). The jury is instructed that, upon finding negligence, the jury should determine whether a defendant should have known that its conduct "created a high degree of probability of injury ... and thereby showed complete indifference to or conscious disregard for the safety of others...."[21]

21. The instruction under which the punitive damages claim was submitted to the jury, Instruction number 19, is as follows:

If you find in favor of plaintiff Kimberly Alcorn and against defendant Union Pacific Railroad Company under Instruction Number 7 and if you believe that:

First, defendant Union Pacific Railroad Company knew that the crossing was unusually hazardous because it did not afford southbound motorists adequate sight distance to observe trains approaching the crossing from the west and Defendant Un-

To the jury "the high degree of probability" may be satisfied by the mere fact that this particular collision occurred. A defendant's aggressive defense at trial on either the issue of breach of duty or causation may supply, in the jurors' minds, the "complete indifference" or "conscious disregard" element. That is why careful judicial scrutiny is needed to determine whether the conduct was so egregious that it was "tantamount to intentional wrongdoing." *Lopez*, 26 S.W.3d at 160. Moreover, the conduct must be such that injury is its "natural and probable consequence." *Id.*

The remedy of punitive damages is "so extraordinary or harsh that it should be applied only sparingly." *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 110 (Mo. banc 1996). The remedy is, after all, imposed as punishment for and deterrence of bad conduct. *Id.*

Factors that weigh against submission of punitive damages claims are circumstances in which: "prior similar occurrences known to the defendant have been infrequent; the injurious event was unlikely to have occurred absent negligence on the part of someone other than the defendant; and, the defendant did not knowingly violate a statute, regulation, or clear industry standard designed to prevent the type of injury that occurred." *Lopez*, 26 S.W.3d at 160.[22]

While there were serious sight problems at the 501 crossing, there were passive warning devices that Union Pacific believed satisfied its duty to the public. The railroad's conduct is not a model for crossing safety. For purposes of negligence, the railroad was on notice as to the hazardous condition of this crossing. But there was no clear evidence that Union Pacific knowingly violated an applicable regulation or statute by failing to upgrade the crossing from the passive warning to lights and gates. While there was evidence that the crossing did not meet an industry standard, such standards are not necessarily relevant to the issue of punitive damages where there is a regulatory scheme. Union Pacific was in the process of upgrading the crossing at the behest of the state. There is no showing that Union Pacific failed to cooperate with the state in its efforts or that the railroad in any way violated an applicable regulation or resisted the regulatory process.

There is little doubt that the jury was displeased by Union Pacific's failure to have gates and lights at this crossing. A Union Pacific official testified that the railroad does not take any responsibility for identifying hazardous crossings and spends no money on its own for eliminat-

---

ion Pacific Railroad Company failed to use ordinary care to warn of it, and

Second, Defendant Union Pacific Railroad Company knew or had information from which Defendant Union Pacific Railroad Company, in the exercise of ordinary care, should have known that such conduct created a high degree of probability of injury, and

Third, defendant Union Pacific Railroad Company thereby showed complete indifference to or conscious disregard for the safety of others, then, in Verdict A, you may find that the defendant Union Pacific Railroad is liable for punitive damages.

If you find that defendant Union Pacific Railroad Company is liable for punitive damages in this stage of the trial, you will be given further instructions for assessing the amount of punitive damages in the second stage of the trial.

22. While not argued by Union Pacific, it should be noted that the jury found that 25 percent of the fault for Alcorn's injuries was attributed to Amtrak's negligence. We thus do not consider whether that factor might also weigh against submission of a punitive damages claim.

ing hazardous crossings. Union Pacific has never spent its own money in Missouri to upgrade a crossing to lights and gates, but waits for public funds. When the state determined that lights and gates were needed at the 501 crossing, Union Pacific did not tell Amtrak engineers that lights and gates had been recommended for the 501 crossing, nor did it do anything in the interim to inform the public. The railroad's representative testified that "we were letting the process take care of itself." If there was no regulatory scheme, or if there was evidence that the railroad failed to cooperate or comply with the regulatory process, punitive damages might appropriately have been considered.

The punitive damages verdict of $120 million certainly showed the jurors' evident displeasure that such a devastating accident would occur and that Union Pacific was in large part at fault. But this does not equate to a judicial determination that the railroad's conduct was tantamount to intentional wrongdoing.

Union Pacific was clearly on notice that its 501 crossing was dangerous, and when the state determined that lights and gates were needed, the railroad did have the option immediately to upgrade the crossing. There was ample evidence that state regulators would approve immediate upgrading if Union Pacific had requested it. The risk that Union Pacific took, upon notice of the hazard, was full exposure to common law liability in negligence until the state-approved changes were made. See section 389.614, discussed above.

Where the railroad in fact cooperated with the regulatory process, reliance upon

that process to do the crossing upgrade in due course does not relieve the railroad of liability in negligence. But conformity with the regulatory process does negate the conclusion that the railroad's conduct was tantamount to intentional wrongdoing.

There was not a submissible case for punitive damages.[23]

**The trial court did not abuse its discretion in failing to further remit Alcorn's compensatory damages**

■■■ Union Pacific and Amtrak contend that the trial court abused its discretion in failing to remit Alcorn's compensatory damages to an amount less than $25 million.

In Missouri, a court may order remittitur "if, after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injury and damages." Section 537.068. The remittitur statute was designed to craft equitable compensation and to eliminate, if possible, the retrial of lawsuits. *Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 656 (Mo.App.1997).

■■■ The trial court will be deemed to have abused its discretion where the remitted judgment is still so grossly excessive as to shock the conscience of the appellate court. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 871 (Mo. banc 1993). An appellate court should exercise its power to interfere with the judgment of the jury and trial court with hesitation and only when the verdict is

---

**23.** Union Pacific asserts that the trial court erred in not further remitting the amount of punitive damages and in allowing Alcorn to recover prejudgment interest on the punitive damages. Union Pacific also challenges the constitutionality of section 537.675 on puni-

tive damages. Because of our conclusion that punitive damages were not submissible, it is unnecessary to reach these issues. There is no challenge to prejudgment interest on the compensatory damages judgment.

manifestly unjust. *Fust v. Francois,* 913 S.W.2d 38, 49 (Mo.App.1995).

■■■■■■ To determine whether a verdict is manifestly unjust, an appellate court reviews the evidence in the light most favorable to the verdict. *Barnett,* 963 S.W.2d at 656. In determining whether Alcorn was reasonably compensated for her injuries, consideration may be given to the nature and extent of the injuries sustained, diminished earning capacity, economic conditions, plaintiff's age, and a comparison of the compensation awarded in cases of comparable injury. *Seabaugh v. Milde Farms, Inc.,* 816 S.W.2d 202, 211 (Mo. banc 1991). A judgment may be based in part on "certain intangibles" that "do not lend themselves to precise calculation," such as past and future pain, suffering, effect on life-style, embarrassment, humiliation, and economic loss. *Callahan,* 863 S.W.2d at 872 (citation omitted). There is no exact formula for determining whether an award of compensatory damages is excessive, and each case must be considered on its own set of facts. *Id.* The ultimate test is whether the award fairly and reasonably compensates the plaintiff for the injuries incurred. *Seabaugh,* 816 S.W.2d at 211.

■■■■ Considering the deference given the trial judge, the amount in this case is not manifestly unjust. Alcorn suffered extremely serious, painful, debilitating and permanent injuries. We defer to the trial court's superior opportunity to observe the witnesses, including Alcorn herself, and to make a determination as to what portion of the jury's award was sustained by the evidence in the case. There is no basis for overturning the trial court's assessment.[24]

24. The evidence shows that Alcorn's economic losses were $2,010,157.59. When her compensatory damages were remitted to $25 million, the ratio of non-economic to economic damages is 11.5 to 1. There is no bright line

## Conclusion

The judgment for punitive damages is reversed. In all other respects, the judgment is affirmed.

PRICE, C.J., WHITE, HOLSTEIN and BENTON, JJ., and AUTREY and WALLACE, Sp. JJ., concur. LIMBAUGH and LAURA DENVIR STITH, JJ., not participating.

test or formula in computing noneconomic losses, *Callahan,* 863 S.W.2d at 871–72, and there is no basis in this particular ratio to overrule the trial court's determination.